**ABBOTT REDMONT THINLITE CORP.,**
**Plaintiff,**

v.

**Rudolph R. REDMONT and Circle Redmont Corp., Defendants.**

**No. 66 Civ. 2245.**

United States District Court,
S. D. New York.

March 30, 1971.

M. Carl Levine, Morgulas & Foreman, New York City, for plaintiff; Allen Ross, David Morgulas, New York City, of counsel.

Royall, Koegel & Wells, New York City, for defendants; David F. Dobbins, New York City, of counsel.

OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

LEVET, District Judge.

This is an action by Abbott Redmont Thinlite Corp. (hereinafter "Abbott") against its former president, Rudolph R. Redmont (hereinafter "Redmont"), and Redmont's present company, Circle Redmont Corp. (hereinafter "Circle"), to recover profits earned by Circle on certain contracts which plaintiff contends were "business opportunities" of plaintiff, concerning which defendants had no right to compete.

The court's jurisdiction rests on the provision of 28 U.S.C. § 1332 (diversity of citizenship), the action having been removed from New York Supreme Court, Bronx County, pursuant to 28 U.S.C. § 1441.

Prior to the entry of the pretrial order, a demand for temporary injunctive relief was withdrawn. Thus, only a claim for damages remains. This court directed that the issue of liability be tried first pursuant to Rule 42(b) of the Federal Rules of Civil Procedure and the case was tried before the court without a jury.

After hearing the testimony of the parties and examining the pleadings, the exhibits and the proposed findings of fact and conclusions of law submitted by counsel, I make the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

1. Plaintiff is a corporation incorporated under the laws of the State of New York (Complaint, par. 1; Answer, par. 1).

2. Defendant Redmont is a resident of the State of Connecticut. Redmont was the president of plaintiff from its formation to April 1, 1966 (Complaint, par. 3; Answer, par. 6).

3. Defendant Circle is a corporation incorporated under the laws of the State of Connecticut. Since its inception it has been engaged in the sale, manufacture and installation of rooflights and toplights (Tr. 62).

4. Redmont, since May, 1966, has been the president of and chief operating officer of defendant Circle (Px. 14, p. 4).[1]

5. Prior to joining Abbott, Redmont had been in the skylight business for approximately fifteen years and immediately prior to joining the plaintiff was engaged in the distribution, through his own company, Redmont Structures, of thinlite, a glass wall curtain made by Owens-Illinois (DX A). Redmont Structures also distributed toplights (Tr. 62–64).

6. From the time that Abbott was formed in 1959 until Redmont left it at the end of March 1966, Redmont served under an oral contract as president of plaintiff-corporation on a fixed salary plus expenses. This oral contract contained no covenant against competition in the event that defendant should ever leave the employ of plaintiff-corporation (Tr. 72). Redmont was not a director and owned no stock, all of the stock thereof being owned by Abbott Glass Company (Tr. 70–72, 105). Redmont's duties while he was president of Abbott were generally to promote the products sold by Abbott and to get those products specified by architects on construction projects; to prepare bids for Abbott for submission to general contractors on those jobs where Abbott's products were specified; and, after submitting such bids, to contact general contractors or other customers involved to obtain contracts for the furnishing and installation by Abbott of the materials previously specified (Tr. 100 et seq.).

7. Prior to the time he left plaintiff-corporation, Redmont on behalf of Abbott, performed promotional duties and submitted bids to general contractors and customers for the purpose of getting Abbott's products specified and obtaining contracts for Abbott for the installation of toplights and rooflights on the following jobs which form the basis of this action:

| JOB | | TYPE |
|---|---|---|
| A. | Plainfield Library | Toplight |
| B. | Oakland High School | Toplight |
| C. | Junior High School 144 | Toplight |
| D. | Riverdale Girls School | Toplight |
| E. | Manhattan Pumping Station | Rooflight |

(Tr. 16–20, 118).

8. Both toplights and rooflights are types of skylights. Rooflights consist of heavy glass blocks placed in concrete grids and sealed with a tar and sulphur

---

1. Defendants' exhibits will be referred to as "DX ———" and plaintiff's exhibits as "PX ———."

base (Tr. 68). They are anti-corrosive and are used primarily in sewage plants (Tr. 97–98). Toplights are a type of skylight consisting of heavy glass blocks in interlocking aluminum grids sealed with thiokol (Tr. 68). They are used primarily in schools and other public institutions (Tr. 68, 98).

9. With respect to the rooflights, Abbott bought the glass blocks directly from Owens-Illinois (Tr. 38) and then installed these rooflights at the particular job site (Tr. 28).

10. With respect to toplights, however, Abbott did not buy the glass blocks from Owens-Illinois, nor did it manufacture the grid system. This manufacture of the aluminum grid system was done by Products Research Corporation (hereinafter "PRC"), which purchased the block from Owens-Illinois (Tr. 76). These fully manufactured toplights were then installed at the job site by Abbott (Tr. 23).

11. The market for toplights and rooflights is a limited one, and the availability of these potential public works projects are matters of common knowledge well before the actual erection starts (Tr. 38–39). Furthermore, the bids on these jobs are not secret. They are inserted in trade publications such as Brown's Letters and Dodge Reports and subcontractors, including both Abbott and Redmont, regularly subscribe to at least one of these services (DX N, p. 86; Tr. 98–99). The bids, insofar as skylights are concerned, are not on a sealed or competitive basis, but rather are the subject of open bidding and negotiation between the contractor and interested potential subcontractors (Tr. 40, 121).

12. Insofar as the sale and installation of these specific glass block toplights and rooflights are concerned in the Metropolitan New York Area, market conditions during the period here involved were such that Abbott basically had no competition for its specific product line (Tr. 104). However, there were many different types of competing

product lines, such as skylights made of plastic (Tr. 32, 42).

Furthermore, although it was generally true that once Abbott's products were specified by the architect this usually meant Abbott would get the final contract, nevertheless, the specifications for at least one of plaintiff's potential contracts (the Riverfront Power House in Albany, New York) were changed at the last minute because the customer was uncertain about repairs since PRC was going out of business (Tr. 85).

13. In early 1966, Owens-Illinois announced that it was getting out of the glass block business. This announcement affected every product line handled by Abbott: rooflight, toplight and thin-lite (DX N, p. 36; Tr. 76). In addition, some time in the middle of February, 1966, PRC informed its customers that, as a result of Owens-Illinois' action, it, too, was leaving the glass block business (Tr. 77–78).

14. Shortly after the announcement was made by PRC in February, 1966, Abbott put in protective orders for the toplights on the four toplight jobs in which plaintiff seeks an accounting for the profits (Tr. 113). These jobs are the Plainfield Library, Oakland High School, Junior High School 144 and Riverdale Girls School (Tr. 17).

15. On May 18, 1966, however, PRC sent a letter to Abbott referring to eleven toplight orders from Abbott "which we have not entered because we have received no shop drawings," and advising Abbott that a failure to receive shop drawings by June 6, 1966 would result in a cancellation of the orders (PX 20).

16. Faced with this deadline, Abbott railed to secure the necessary shop drawings for these toplight jobs, including the four involved here (Tr. 135–138). On June 7, 1966, PRC cancelled these orders and returned them to Abbott (DX N, pp. 45–46).

17. There is no evidence that plaintiff ever found another supplier of either rooflights or toplights after June 7,

1966, thus placing itself in a non-competitive position after that date with respect to at least toplights. Moreover, even prior to June 7, 1966, plaintiff made no concerted effort to close those potential contracts on which it had entered bids. No personal visits were made to any of the contractors involved. The only contact with these contractors appears to have been a phone call by Mr. Edmund Seith, an employee of plaintiff. These phone calls were of such insubstantial consequence, however, that Seith could not even remember what was said (Tr. 135–138).

18. Prior to these events, in March, 1966, George Abrams, executive vice president of Abbott Glass, told Redmont that if he wanted to stay with Abbott he would have to take a cut in salary. As an alternative, however, Abrams at this time offered Redmont the opportunity of buying Abbott's rooflight inventory at cost and going into business on his own (Tr. 80–82).

19. Redmont and Abrams entered into a series of negotiations concerning (1) the possibility of an agreement whereby Redmont would purchase plaintiff's rooflight inventory; and (2) the possibility that Redmont would assume all of plaintiff's outstanding skylight contracts and share the profits. These negotiations produced a series of offers by Redmont, none of which was accepted by plaintiff (Tr. 84–88, 91, 120; DX F, G, H, I and K). Redmont left Abbott on April 1, 1966 (Tr. 84).

20. On the dates hereinafter indicated, Redmont, acting by and for Circle, entered into contracts for the toplight and rooflight work on the projects referred to in Finding of Fact No. 7 above, as follows:

| JOB | DATE OF CONTRACT | |
|---|---|---|
| A. Plainfield Public Library | 4/18/66 | (DX J) |
| B. Oakland High School | 6/2/66 | (PX 12) |
| C. Junior High School 144 | 7/20/66 | (PX 10) |
| D. Riverdale Girls School | 8/5/66 | (PX 7) |
| E. Manhattan Pumping Station | 8/5/66 | (PX 5) |

## DISCUSSION

Plaintiff's claim then is that defendant Redmont, in closing these five contracts for himself, dealt unfairly with his previous employer in some manner and should therefore be held accountable to plaintiff for his profits on these projects.

Plaintiff's legal argument vacillates between a theory of unfair competition on the one hand and violation of the corporate opportunity doctrine on the other. Neither is apposite here.

As to the claim of unfair competition, it must first be noted that Redmont's employment contract with Abbott contained no restrictive covenant as to competition (see Finding of Fact No. 6). In the absence of such a restrictive covenant, the law of New York requires a showing that the former employee, while engaging in competition with his former employer, used confidential information acquired during his former employment. Town and Country House & Home Service, Inc. v. Newbery, 3 N.Y.2d 554, 170 N.Y.S.2d 328, 147 N.E.2d 724 (1958); S. Tepfer & Sons Inc. v. Zschaler, 25 A.D.2d 786, 269 N.Y.S.2d 552 (2nd Dept. 1966); Hudson Valley Propane Corp. v. Byrne, 24 A.D.2d 908, 264 N.Y.S.2d 416 (3rd Dept. 1965).

There is simply no proof here of use by defendant of any confidential information acquired while in the employ of Abbott. No secret customer lists are involved. Anyone familiar with the business would know of the existence of potential buyers of skylights (see Finding of Fact No. 11). The bids put in by plaintiff-corporation to the five contractors involved here were far from secret. They were published in two different trade publications. Moreover, the bids were not sealed but rather were the subject of open bidding and negotiation between the contractor and interested subcontractors (see Finding of Fact No. 11).

The case of S. W. Scott and Co. v. Scott, 186 App.Div. 518, 174 N.Y.S. 583

(1st Dept. 1919) comes very close to being directly on point here. That case involved an insurance salesman who, after resigning from an executive position with his former employer, began competing with his former employer for customers which he had developed and was paid to develop during the course of his employment.

In denying plaintiff's request to enjoin the salesman Scott from competing the court held:

"It will be noted that the defendant Scott in leaving the employ of the plaintiff did not break any contract of employment, nor was there any contract that on leaving the plaintiff's employ he would not engage in a similar business. Therefore the injunction cannot be sustained on the theory that the defendant Scott is violating any contract right.

"The injunction must be supported, if at all, upon the theory that a man who has been employed by another cannot thereafter engage in the same business, in competition with his former employer, and solicit the business of his employer's customers. It is not alleged that, while in the plaintiff's employ, he tried to divert business from the plaintiff. It cannot be alleged that his acquaintance with either the insurance companies or the brokers was acquired while in plaintiff's employ. He had been in the insurance business in New York City for 20 years It was because he was an experienced insurance solicitor and underwriter, well known among the insurance companies and brokers, that Webster employed him to manage his new department. The plaintiff's theory seems to be that they could get the benefit of Scott's knowledge and experience acquired in the employ of others, but that because out of 20 years of business life in this one line of business he spent fifteen months in plaintiff's employ, he cannot devote his skill, knowledge, and acquaintance in a business for himself, because by so doing the plaintiff suffers some loss of trade. Such is not the law." 186 App.Div. at 523–524, 174 N.Y.S. at 586.

Similarly, in the instant case it is not alleged that while in plaintiff's employ Redmont tried to divert business from plaintiff. Furthermore, Redmont, like Mr. Scott, garnered his experience and reputation in the business long before he came to work for plaintiff—and, as pointed out above, used no confidential information acquired while with plaintiff in his competitive efforts. The Scott case makes it clear that plaintiff in such a situation simply has no right to restrain competition by his former employee.

This brings us next to plaintiff's corporate opportunity argument. The fact that plaintiff usually places the words "business opportunities" in quotation marks when he uses them indicates a certain hesitancy in availing himself of that doctrine. His caution is well taken.

The so-called corporate opportunities in this case are the five contracts that Redmont had begun negotiations on for plaintiff, but which he closed in his own name after leaving Abbott.

One might assume that the Scott case covers this argument as well and dispense with any further consideration of plaintiff's case. Such wholesale reliance on Scott is unnecessary, however, since plaintiff's arguments here fall of their own weight.

■ First, plaintiff places great emphasis on the fact that Redmont had worked on the negotiation of the contracts in question prior to leaving the plaintiff-corporation. However, as pointed out above, there is absolutely no indication that Redmont acquired any confidential information as a result. He had been an expert in the business prior to coming to work for plaintiff; potential customers would be known to anyone familiar with the business; and the bids involved were public knowledge.

■ Furthermore, for the corporate opportunity doctrine to apply, the opportunities in question must be property

in which the corporation had a "tangible expectancy" at the time the fiduciary acquired it. Burg v. Horn, 380 F.2d 897 (2nd Cir. 1967); Guth v. Loft, 23 Del. Ch. 255, 5 A.2d 503 (Sup.Ct.Del.1939); I Hornstein, Corporation Law and Practice, § 441.

██ The contracts in question were hardly "tangible expectancies" of Abbott. It is not clear that Abbott would have closed any of the contracts even if Redmont had refrained from competing. First of all, Abbott made no concerted effort to finalize any of these contracts, and in at least four it was facing a deadline from its only supplier of toplights.[2] Plaintiff's answer is that it had a monopoly in the glass block skylight business and that once the architect specified such skylights, plaintiff had only to sit back and wait for the contracts to ripen because there were no other PRC toplight (nor rooflight, for that matter) distributors in the New York Area.

It appears that this is not totally correct factually. The specifications for at least one of plaintiff's potential contracts were changed at the last minute because the customer was uncertain about future repairs since PRC was going out of business (see Finding of Fact No. 12).

However, even assuming the correctness of plaintiff's assertion that its monopoly meant that once its glass block products were specified it would be sure to get a contract, we still cannot rule for plaintiff. For the obvious fact is that once Redmont opened his own business, plaintiff no longer had such a monopoly. Thus, the only way that the architects' specifications could ripen into contracts without further effort by

plaintiff and thereby create "tangible expectancies" on behalf of plaintiff is if plaintiff succeeds in having this court rule that its monopoly should be protected.

Thus, plaintiff's position reduces to a claim that its monopolistic position should be protected precisely because it has a monopoly. Even ignoring the circularity of this argument, this court knows of no rule of law that entitles plaintiff to a court-ordered continuation of a monopoly.

In conclusion, plaintiff has offered nothing to distinguish this case from the ordinary one where an employee competes with his former employer for the latter's customers. Such competition is not only economically healthy but specifically sanctioned by a long line of authority headed by the Scott case.

## CONCLUSIONS OF LAW

1. The court has jurisdiction over the parties and the subject matter. 28 U.S.C. §§ 1332, 1441.

2. Defendants did not engage in unfair competition against Redmont's former employer, Abbott, S. W. Scott and Co. v. Scott, supra; Town and Country House & Home Service, Inc. v. Newbery, supra.

3. The five contracts in dispute were not "corporate opportunities" of plaintiff, and defendants did not, therefore, appropriate them in violation of any duty owed to plaintiff. Burg v. Horn, supra; Guth v. Loft, supra; I Hornstein, Corporation Law and Practice, § 441.

4. Defendants are entitled to judgment herein dismissing the complaint with costs.

Settle judgment on notice.

---

2. With regard to two of these contracts (Junior High School 144 and Riverdale Girls School) there is, in fact, a very serious question whether plaintiff ever established the "fact of damage" essential to his burden of proof. See Flintkote Company v. Lysfjord, 246 F.2d 368 (9th Cir. 1957). It appears that plaintiff was not able to compete with defendant on these two contracts when defendant closed them because it had allowed its supply of toplights to disappear in early June, 1966 (see Findings of Fact Nos. 16, 17). These contracts were closed by defendant well after that date. If it was impossible for plaintiff to perform on these two contracts then this court fails to see how plaintiff was damaged when defendant closed them.