## OSCAR M. MILLER v. BENJAMIN A. MILLER AND OTHERS.

222 N. W. 2d 71.

September 20, 1974—No. 43759.

*Streater, Murphy, Brosnahan & Langford, Roger P. Brosnahan, Kent A. Gernander, Faegre & Benson,* and *James T. Hale,* for appellant.

*Leonard, Street & Deinard, Melvin H. Siegel,* and *Charles A. Mays,* for respondents.

ROGOSHESKE, JUSTICE.

This is a shareholder's derivative action brought by Oscar M. Miller, a minority shareholder, for the benefit of Miller Waste Mills, Inc., (hereafter Miller Waste) to recover assets and profits of the other named defendant corporations. Those corporations (hereafter called defendant corporations) are owned and controlled by defendants Rudolph W. Miller and Benjamin A. Miller, who, while in active management of Miller Waste, established defendant corporations, and who, it is alleged, wrongfully diverted corporate opportunities properly belonging to Miller Waste to defendant corporations. Following a lengthy trial by the court sitting without a jury and the denial of post-trial motions, judgment was entered dismissing plaintiff's complaint, and he appeals. Based upon the facts as found by the trial court and application of the corporate opportunity doctrine as we interpret it, we hold that defendants Rudolph W. and Benjamin A. Miller did not wrongfully appropriate to defendant corporations or to themselves any corporate opportunities belonging to Miller Waste. Accordingly, we affirm the decision of the trial court.

The parties agree that the determinative facts as found by the trial court relevant to the main issue presented for review are not in substantial dispute. A summary taken mainly from the comprehensive and detailed findings of the trial court follows. Plaintiff and defendants Rudolph and Benjamin Miller are the sons of Joseph and Jennie Miller. In the 1890's, Joseph Miller established a general scrap business in Winona for dealing in metals, hides, paper, rags, and like reclaimable materials. His wife, Jennie, and their family of four sons and four daughters, including plaintiff and defendants Rudolph and Benjamin, all worked in his business at times. In 1923, Joseph purchased a "waste puller" machine to enter the waste business. The business thereafter consisted essentially of buying rags and waste threads and other textile materials from brokers and textile mills for the manufacture and sale of "packing waste" and "wiping waste."

By use of the machine, these materials were processed by shredding, cutting, cording, and blending them into manufactured products known as "packing waste" and "wiping waste." Packing waste was sold to railroads for use, after saturation with oil, for packing journal boxes of freight cars to lubricate the cars' journals or axles. Wiping waste was used by railroads and other heavy industries for wiping engines and other machinery. The company also cut, trimmed, laundered, and sold rags to industries for wiping cloths.

The business was incorporated in 1927 as Miller Waste Mills, Inc., "to manufacture waste and wiping cloth" of all kinds and "to do such other business as may be incidental to or reasonably necessary to effectuate such manufacturing business." With the exception of one share of common capital stock issued to an attorney, all of the remaining 868 then outstanding shares were issued to Joseph, Jennie, Oscar, and Rudolph, who at and prior to incorporation were actively engaged in the business, with Joseph retaining controlling interest. The 40 shares of stock initially issued to plaintiff, Oscar, were redeemed sometime in 1932, when he terminated his relationship with the corporation and became engaged as a securities and stock investment analyst in New York City until his retirement. In 1932, Benjamin left college to become active in the business and was issued 40 shares of stock. Since its inception and in accordance with its charter, the corporation's primary business remained the buying, processing, and high-volume production of thread waste in bulk for journal box packing and for wiping, both of which types are typically shipped in bales weighing from 200 to 600 pounds.

In 1940, Miller Waste underwent an extensive reorganization. Joseph, then aged 75 and in ill health, retired from active participation although he retained three shares of stock and remained a director of the corporation until his death in 1946. His shares of stock were either redeemed by the corporation or sold, along with certain of Jennie's shares, to Rudolph and Benjamin, each of whom became the owner of 128 shares—which, together, con-

stituted a majority of the then outstanding shares of stock. Jennie retained 167 shares of stock, remained a director of the corporation, attended meetings of the board, and took an active interest in its business until 1962. She retained her stock until her death in 1964 at age 91. Contemporaneously with this reorganization, Joseph and Jennie executed a joint will, which included the following provisions:

"SECOND, We will and direct that all of the real estate and personal property of every kind and nature whatsoever and wheresoever situated [owned by us] or either of us, shall be held, managed and controlled by the survivor during the balance of his or her natural life, with the right to use the principal, income, interest and profits therefrom as shall be reasonably necessary for the support, care, comfort and pleasure of such survivor, during his or her natural life.

"THIRD, We and the survivor of us give, devise and bequeath to our sons Samuel R. Miller, and Oscar M. Miller, and daughters Lillian Miller Grodnik, Sada R. Goldberg and Ella Miller, each thirty four (34) shares of the common capital stock in the Miller Waste Mills, Incorporated, in fee absolutely. The object and purpose of the gift of these shares of the common capital stock in the Miller Waste Mills, Incorporated, to each of our said children and not to our other children, Benjamin A. Miller, Rudolph W. Miller and Etta Miller Sprung, is to give them approximately the same number of shares as we have heretofore given the latter three children."

Plaintiff, Oscar, thus held, a remainderman's interest in 34 shares of the corporation after Joseph died and was absolute owner upon Jennie's death. Also contemporaneously with the reorganization, a series of agreements were executed. The general purpose of these was to provide security for Joseph and Jennie during their retirement years and to turn over active management of the corporation to Rudolph and Benjamin. Included was an assignment to Joseph of a 45-percent interest in seven speci-

fied, as well as any similar future, patents relating to a "felpax lubricator" which Rudolph, as the inventor, owned and had been working on from about 1932 in the conduct of a separate business known as Miller-Felpax Company, later incorporated as Miller-Felpax Corporation. The consideration for this assignment was Joseph's payment of Rudolph's approximately $30,000 indebtedness to the corporation. Also included was an agreement obligating Rudolph and Benjamin to pay $75 weekly to their parents or the survivor for life. Consideration for this was the transfer to Rudolph and Benjamin by their parents of 176 shares of stock. Following the 1940 reorganization, Rudolph and Benjamin, as officers and directors, controlled and actively managed Miller Waste.

Due to the demand for packing and wiping waste during the war years 1940 to 1943, Miller Waste flourished. It enjoyed gross sales of up to $2,000,000 and had increasing profits, reputable credit, and a stable capital structure. However, in order to secure government contracts for processed waste during World War II, the corporation was compelled to contract for delivery of packaged waste destined for governmental use in small 5- to 7-pound packages. Since the mill was structured for high-volume mass production of bulky, baled waste by unskilled millworkers, the corporation's efforts to meet this requirement were unsuccessful. Its attempts to satisfy its governmental commitments caused disruption of its mass production operations, frequent rejections of its small packages, and increasing financial losses. To solve the problem of the unavailability in Winona of a subcontractor for this small packaging part of the business, Rudolph, Benjamin, and their wives organized a partnership named Unit Manufacturing Company in 1943, and the small packaging business was then transferred to it. Also transferred from the corporation was the business of packaging wiper cloths and two small sideline businesses involving the manufacture of floor mops and an oxygen and acetylene tank business acquired by the

corporation in 1940 when it purchased (and later liquidated)[1] Joseph's scrap business to facilitate his retirement. The creation of Unit Manufacturing Company, its purpose, and its expanding operations were known to and observed and approved by at least Jennie. She and Joseph lived but a few blocks from Unit's plant, located on property adjacent to the original waste mill properties.[2] Under the active management of the wives of Rudolph and Benjamin, and with advice from Rudolph and Benjamin, Unit's initial operations consisted of purchasing waste from Miller Waste, processing it, on an assembly line operated by women, into 5-pound packages, baling the packages in 50- to 60-pound bales, and selling the bales to Miller Waste at a profit to Unit equal to the premium paid by the government to Miller Waste on its contract for small package waste. Unit also pack-

---

[1] The liquidation of the scrap business, and with it the elimination of the need for the welding business, was accomplished in 1942 or 1943. The record does not indicate whether the mop manufacturing business was continued or liquidated. The parties appear to treat it as an insignificant part of the business of Miller Waste.

[2] The trial court found formal corporate ratification of these transfers in these words: "* * * At the adjourned annual meeting of the stockholders of Miller Waste Mills, Inc., held on January 29, 1945, all stockholders were present in person including Jennie and Joseph Miller, although the latter left the meeting shortly after the opening thereof. The question of the formation of Unit Manufacturing Company was brought up by the defendants Rudolph Miller and Benjamin Miller, and a full and complete history of that company was given to the Shareholders. The stockholders, Joseph Miller being absent, ratified the formation of Unit Manufacturing Company and the diversion to it of the wiper business, the small packaging business and the acetylene business. Furthermore, the stockholders present (representing all but three shares owned by Joseph Miller who had left the meeting) ratified and authorized the participation by the defendants Rudolph Miller and Benjamin Miller in Unit Manufacturing Company, and further provided that Miller Waste Mills, Inc. should not be involved in the affairs of the partnership except in the capacity of customers or suppliers, and that all transactions between the two companies should be carried out 'at arms' length'."

aged wiper cloth, a business which consisted of processing, trimming, laundering, cutting to size, and packaging 20- to 50-pound cartons of wiping cloth, which were then sold to machine shops, industrial plants, and garages. As a result of these transfers and the interrelationship, both Miller Waste and Unit Manufacturing Company earned substantial profits.

Unit Manufacturing Company gradually expanded and began manufacturing "filter element socks" and later "filter element cartridges." The "filter socks" were cut and sewn from new cloth, filled with waste, incorporated into metal-cased filter cartridges supplied by another manufacturer, and sold for use as oil filters in diesel engines and other large machines. Later the entire "filter element cartridges" were manufactured by Unit. At the time Unit began manufacturing these products, Miller Waste had no facilities to manufacture the "filter socks" and, much less, the sophisticated metal-cased "filter element cartridges." All waste used by Unit was purchased from Miller Waste "at a profit to the latter equal to or higher than any profit earned from sales to unrelated customers," and a captive market for the waste mill was thereby established. In 1954, the partnership business of Unit was transferred to defendant Filter Supply Corporation, which had been incorporated by Rudolph and Benjamin in 1951.[3]

From 1940 to 1946, Rudolph, pursuing the consent given him at the time of the 1940 reorganization, continued the development of the patented felpax lubricator under his separate business known as Miller-Felpax Company. This lubricator, which used no waste, utilized a laminated, virgin wool, felt wick and was designed for use in diesel locomotives. It was first marketed successfully after World War II when a commercially feasible ver-

[3] In 1960, Unit was dissolved and its personal property was transferred to Filter Supply Corporation. Its real property was conveyed to Unit Holding Company, which subsequently became a wholly-owned subsidiary of defendant Fiberite Corporation, which had been organized by Rudolph and Benjamin in 1948.

sion was developed by Robert Harkenrider while an employee of Miller-Felpax Company, incorporated in 1947 as defendant Miller-Felpax Corporation and wholly owned by Rudolph and his family. About 1950, utilizing principles of capillarity inherent in the felt wick lubricator, Harkenrider developed and patented, with Rudolph, the Miller lubricator. This lubricator was designed to replace the ordinary waste used in freight car journals. An essential component is a "blanket" of waste threads which, by use of a needling machine also designed by Harkenrider, were "needled to pressed cloth containing favorable capillary qualities." The source of the waste thread needed was Miller Waste, which sold bulk waste to defendant Filter Supply Corporation at a profit. This corporation, consonant with its manufacture of the "filter socks" for use in the "filter element cartridges," also manufactured the "blanket" used in the Miller lubricator. Filter Supply Corporation then sold the lubricator blanket to defendant Miller Lubricator Company, incorporated by Rudolph and Benjamin in 1953 for the purpose of manufacturing and selling the completed Miller lubricator. The trial court found that "[n]o personnel of Miller Waste Mills, Inc. had the technical ability to design and manufacture such lubricators nor did [it] have proper machinery or equipment to do so." For a period of about 4 years, this lubricator, approved by the American Association of Railroads from 1953 to 1959, enjoyed great commercial acceptance despite some 15 competing devices on the market, and at one time it was installed on almost 60 percent of all railroad freight cars in the United States. Although the Miller lubricator was in direct competition with Miller Waste's business of selling packing waste, Filter Supply Corporation's need for thread waste made its purchases a captive market of Miller Waste, replacing its declining sales of packing waste to railroads. During 1956 to 1959, Miller Waste sold more thread waste than it had previously sold to railroads for freight car journals. The trial court found:

"* * * Had this 'captive market' not been available Miller Waste Mills, Inc. would have lost its journal 'waste' packing business to other more modern types of railroad car lubricating devices."

Following the suggestion of a friend of Benjamin, and a subsequent discussion between Rudolph, Benjamin, and their mother, Jennie, a decision to enter the plastic business was made, and Rudolph and Benjamin formed and financed defendant Fiberite Corporation in 1948 and defendant Melamine Plastics Corporation in 1952. The purpose of Fiberite Corporation, on whose board of directors Jennie served until about 1956, was to develop and manufacture thermosetting "high impact phenolic molding compounds" to specifications furnished by molders of plastic products such as gears, housings, bearings, and electrical components. Fiberite Corporation did not become a profitable business until October 1950, when a new manager was able to acquire proper equipment and technical personnel and establish proper production quality controls. Melamine Plastics Corporation manufactured similar plastic compounds with a melamine resin base for use in manufacturing dinnerware for the Armed Services. A principal ingredient of both plastic compounds is cotton "cuttings" which serve as a filler or "reinforcing agent." After experiments proved waste threads to be unsatisfactory as a filler, Miller Waste developed sources of supply for the cotton "cuttings" and purchased, warehoused, and sold them to the Fiberite and Melamine corporations at a profit to Miller Waste. The development and manufacture of both plastic compounds required the skill and supervision of trained chemists. Miller Waste had no "facilities, equipment, capacity, or technical knowledge" to engage in such businesses.

Finally, in 1960, Plastic Trading Company was established as a division of Miller Waste upon amendment of its articles of incorporation. Totally unrelated to the Fiberite and Melamine corporations, the division processed thermo plastic scrap or over-

runs. Unlike phenolic and melamine plastic, the manufacture of which is "irreversible," thermo plastics can be "reworked, re-mixed, recolored, and resold."

Since the formation and expansion of these related businesses controlled by Rudolph and Benjamin, Miller Waste has also sold and leased real estate to the businesses and has furnished maintenance, labor, and accounting services to them. Although not negotiated at arm's length, the rentals have been higher than equivalent rentals in the Winona area and the sales of products and services by Miller Waste to defendant corporations were made at prices equal to or higher than those to nonrelated customers. This resulted in "greater profits" to Miller Waste. All sales of real estate between the related corporations were made only after independent appraisals by the American Appraisal Association. Although at the end of the decade 1950-1960, Miller Waste's initial business of manufacturing and selling "wiping and packing waste" to railroads and other industries had declined, the net income of the corporation "was greater than in any year of the history of the company since its inception except for the Korean war year of 1950."

A corporate resolution of February 1943 charged Rudolph and Benjamin "to exert their best efforts" on behalf of Miller Waste, which they did. They were not required by contract or otherwise to devote their time exclusively to the corporation. Contrary to plaintiff's claim at trial, their compensation was neither "excessive nor unreasonable" in view of the corporation's success as compared to its competitors. Out of approximately 40 "waste mills" in the United States in the 1940's, at the time of trial in 1971 there were only four or five surviving, and Miller Waste "handle[d] more waste products of cotton mills and thread waste than all others combined, and [was then] the most successful waste mill in the United States."

Contrary to plaintiff's further assertion at trial, each of the defendant corporations was financed by Rudolph and Benjamin with "their own monies" and neither officer financed any of

them by overdrafts on their accounts, by the handling of inter-company accounts, or by exploiting any "resources" of Miller Waste "other than their own energy, resourcefulness, and business acumen and judgment."

During the times when Rudolph and Benjamin formed and operated defendants Filter Supply Corporation, Miller Lubricator Company, Fiberite Corporation, and Melamine Plastic Corporation, each one's purpose and business were made known to all who were then officers and shareholders of Miller Waste, and particularly their mother, Jennie, was kept informed of the "status of accounts" between Miller Waste, her sons, and defendant corporations. There was no "concealment" from the remaindermen under the joint will, including plaintiff, and financial statements were available to them for the "asking."

In dismissing plaintiff's complaint, the trial court found that none of the businesses of defendant corporations was a corporate opportunity of Miller Waste except the small packaging business of waste and wiper cloth and the manufacture of mops and the welding business, transferred to defendant Unit Manufacturing Company and later, defendant Filter Supply Company, and in addition, the manufacture of "filter element socks" by the latter. However, the court determined that no wrongful diversion was made since the transfers were made or the opportunities seized in good faith and duly ratified by the then officers and shareholders of the waste mill. The court also determined, contrary to defendants' contention, that plaintiff had standing to maintain this action and, alternatively, that, because defendants were prejudiced by the 19-year delay, plaintiff's cause of action was barred by laches.

The principal issue raised by plaintiff, and the one on which our disposition of this appeal rests, concerns the proper standards to be applied in determining whether defendants Rudolph and Benjamin Miller appropriated to themselves business opportunities properly belonging to Miller Waste. Even though the various opportunities were developed by defendant corporations, all

were owned and controlled by Rudolph and Benjamin. Thus, we approach the issue in the same way as if the opportunities were appropriated by the defendants personally.[4]

Having conceded on oral argument, as plaintiff must, that the court's factual findings and the inference drawn therefrom which bear on this issue have ample evidentiary support,[5] he vigorously argues that the trial court, constrained by our decision in Diedrick v. Helm, 217 Minn. 483, 14 N. W. 2d 913, 153 A. L. R. 649 (1944), limited the holding of the landmark case of Guth v. Loft, Inc. 23 Del. Ch. 255, 5 A. 2d 503 (1939), and thereby applied an unduly restrictive "line of business" test or standard in determining that defendants were not liable for any diversion of corporate opportunities, and that application of proper standards requires reversal.

At the outset we acknowledge the well-recognized, common-law principle that one entrusted with the active management of a corporation, such as an officer or director, occupies a fiduciary relationship to the corporation and may not exploit his position as an "insider" by appropriating to himself a business opportunity properly belonging to the corporation. If such a business op-

---

[4] Were defendant corporations not closely held, perhaps at least one of the opportunities, the manufacture of the Miller lubricator, could arguably be found to be more closely associated with the "line of business" of Miller-Felpax Corporation than with Miller Waste. In such cases, it is suggested that the question of which corporation has a prior claim to the opportunity be resolved before reaching the question of the liability of a corporate fiduciary managing two corporations in delivering to one corporation in preference to the other an opportunity which may be found to be in the "line of business" of both. Note, 74 Harv. L. Rev. 765, 771.

[5] Although plaintiff accepts these findings, he contends that those (1) relating to ratification of the establishment of Unit Manufacturing Company, and (2) declaring that permission granted to Rudolph to develop the "Felpax lubricator" constituted a blanket ratification of any further development of related lubricating devices are clearly erroneous. Although we cannot agree with these contentions, we find it unnecessary to discuss the issue of ratification.

portunity is usurped for personal gain, it is equally well recognized that the opportunity and any property or profit acquired becomes subject to a constructive trust for the benefit of the corporation. Guth v. Loft, Inc. *supra*. This principle, usually referred to as the doctrine of corporate opportunity, is derived essentially from fundamental rules of agency concerning the duty of utmost good faith and loyalty owed by a fiduciary to his principal[6] and also from the law of constructive trusts embodying equitable principles of unjust enrichment. Diedrick v. Helm, *supra*.[7]

Although the rule prohibiting usurpation of corporate opportunities is easy to state, difficulties arise in its application. The main problem confronting courts concerns the proper test or standards to apply in determining whether a business opportunity properly belongs to the corporation.[8] Guth v. Loft, Inc., *supra*, cited by virtually all jurisdictions confronted with the problem, adopted the following standards (23 Del. Ch. 271, 5 A. 2d 510):

"It is true that when a business opportunity comes to a corporate officer or director in his individual capacity rather than in his official capacity, and the opportunity is one which, because of the nature of the enterprise, is not essential to his corporation, and is one in which it has no interest or expectancy, the officer or director is entitled to treat the opportunity as his own, and the corporation has no interest in it, if, of course the officer or director has not wrongfully embarked the corporation's resources therein. * * *

---

[6] Cf. Minn. St. 301.31: "Officers and directors shall discharge the duties of their respective positions in good faith, and with that diligence and care which ordinarily prudent men would exercise under similar circumstances in like positions."

[7] See, also, Carrington and McElroy, *The Doctrine of Corporate Opportunity as Applied to Officers, Directors and Stockholders of Corporations*, 14 Bus. Lawyer 957 (July, 1959); 3 Fletcher, Cyc. Corporations (Perm. ed.) § 838; Ballantine, Corporations (Rev. ed.) § 79.

[8] Slaughter, *The Corporate Opportunity Doctrine*, 18 Sw. L. J. 96.

"On the other hand, it is equally true that, if there is presented to a corporate officer or director a business opportunity which the corporation is financially able to undertake, is, from its nature, in the line of the corporation's business and is of practical advantage to it, is one in which the corporation has an interest or a reasonable expectancy, and, by embracing the opportunity, the self-interest of the officer or director will be brought into conflict with that of his corporation, the law will not permit him to seize the opportunity for himself."

While this court has dealt with the problem and has acknowledged the general principles embodied in the doctrine of corporate opportunity, the necessity of adopting a specific formula for determining when a business opportunity properly belongs to the corporation has not previously been directly presented. Hart v. Bell, 222 Minn. 69, 23 N. W. 2d 375, 24 N. W. 2d 41 (1946); Boxrud v. Ronning Machinery Co. 217 Minn. 518, 15 N. W. 2d 112 (1944); Diedrick v. Helm, *supra.* In Diedrick, our leading case, we cited the principles and standards set forth in Guth and also in Solimine v. Hollander, 128 N. J. Eq. 228, 16 A. 2d 203 (1940), but expressly deemed it unnecessary to formulate "an all-inclusive definition of what constitutes a 'corporate opportunity'" for the decision in that case. 217 Minn. 493, 14 N. W. 2d 919, 153 A. L. R. 658. Even though the Diedrick case is cited as adopting what might be called the five-pronged Solimine test [9] for determining the existence of corporate opportunities,[10] we

---

[9] 4 Dunnell, Dig. (3 ed.) § 2096.

[10] According to Solimine v. Hollander, 128 N. J. Eq. 228, 246, 16 A. 2d 203, 215 (1940), a business opportunity is not a corporate one "(a) wherever the fundamental fact of good faith is determined in favor of the director or officer charged with usurping the corporate opportunity, *or* (b) where the company is unable to avail itself of the opportunity, *or* (c) where availing itself of the opportunity is not *essential* to the company's business, *or* (d) where the accused fiduciary does not

interpret the court's opinion as relying mainly upon the "line of business" test enunciated in Guth.

Apart from our prior treatment of the problem, other jurisdictions have also experienced difficulties in applying proper standards. We have searched the case law and commentary in vain for an all-inclusive or "critical" test or standard by which a wrongful appropriation can be determined and are persuaded that the doctrine is not capable of precise definition. Rather, it appears that courts have opened or closed the business opportunity door to corporate managers upon the facts and circumstances of each case and by application of one or more of three variant but often overlapping tests or standards: (1) The "interest or expectancy" test, which precludes acquisition by corporate officers of the property of a business opportunity in which the corporation has a "beachhead" in the sense of a legal or equitable interest or expectancy growing out of a preexisting right or relationship;[11] (2) the "line of business" test, which characterizes an opportunity as corporate whenever a managing officer becomes involved in an activity intimately or closely associated with the existing

---

exploit the opportunity by the employment of his company's resources, *or* (e) where by embracing the opportunity personally the director or officer is not brought into direct competition with his company and its business." Note that each of the above considerations is mutually exclusive and that the presence of any one consideration precludes the finding of a usurpation of a corporate opportunity.

[11] For example, a corporation which possesses a lease on certain property or operates under a patent license is deemed to have an "interest" or "expectancy" in such property or license as to preclude the appropriation of such interests by the corporate fiduciaries. See, Feuer, Personal Liabilities of Corporate Officers and Directors, p. 79; Burg v. Horn, 380 F. 2d 897 (2 Cir. 1967); Blaustein v. Pan Am. Petroleum & Transport Co. 293 N. Y. 281, 56 N. E. 2d 705 (1944); Abbott Redmont Thinlite Corp. v. Redmont, 324 F. Supp. 965 (S. D. N. Y. 1971); 3 Fletcher, Cyc. Corp. (Perm. ed.) § 861.1; Slaughter, *The Corporate Opportunity Doctrine,* 18 Sw. L. J. 96; Note, 74 Harv. L. Rev. 765.

or prospective activities of the corporation;[12] and (3) the "fair-. ness" test, which determines the existence of a corporate opportunity by applying ethical standards of what is fair and equitable under the circumstances.[13]

The Guth case, most often cited as establishing the "line of business" test—more flexible in scope than the restrictive "interest or expectancy" test of earlier decisions—also recognized the practical fairness approach which has been employed in more recent decisions (23 Del. Ch. 279, 5 A. 2d 514):

"* * * [T]he appellants say that the expression, 'in the line' of a business, is a phrase so elastic as to furnish no basis for a useful inference. The phrase is not within the field of precise definition, nor is it one that can be bounded by a set formula. *It has a flexible meaning, which is to be applied reasonably and sensibly to the facts and circumstances of the particular case. Where a corporation is engaged in a certain business, and an opportunity is presented to it embracing an activity as to which it has fundamental knowledge, practical experience and ability to pursue, which, logically and naturally, is adaptable to its business having regard for its financial position, and is one that is*

[12] Guth v. Loft, Inc. 23 Del. Ch. 255, 5 A. 2d 503 (1939); The Equity Corp. v. Milton, 43 Del. Ch. 160, 221 A. 2d 494 (1966); Hubbard v. Pape, 2 Ohio App. 2d 326, 203 N. E. 2d 365 (1964); Note, 74 Harv. L. Rev. 765, 768; Walker, *Legal Handles Used to Open or Close the Corporate Opportunity Door,* 56 Nw. U. L. Rev. 608.

[13] Durfee v. Durfee & Canning, Inc. 323 Mass. 187, 80 N. E. 2d 522 (1948); Alvest, Inc. v. Superior Oil Corp. 398 P. 2d 213 (Alaska 1965); Rosenblum v. Judson Engineering Corp. 99 N. H. 267, 109 A. 2d 558 (1954); Industrial Indemnity Co. v. Golden State Co. 117 Cal. App. 2d 519, 256 P. 2d 677 (1953); Tower Recreation, Inc. v. Beard, 141 Ind. App. 649, 231 N. E. 2d 154 (1967); Weiss v. Kay Jewelry Stores, Inc. 152 App. D. C. 350, 470 F. 2d 1259 (D. C. Cir. 1972); Paulman v. Kritzer, 74 Ill. App. 2d 284, 219 N. E. 2d 541 (1966); Raines v. Toney, 228 Ark. 1170, 313 S. W. 2d 802 (1958); Note, 74 Harv. L. Rev. 765; Slaughter, *The Corporate Opportunity Doctrine,* 18 Sw. L. J. 96, 99; Ballantine, Corporations (Rev. ed.) § 79, p. 205.

*consonant with its reasonable needs and aspirations for expansion, it may be properly said that the opportunity is in the line of the corporation's business."* (Italics supplied.)

In Durfee v. Durfee & Canning, 323 Mass. 187, 199, 80 N. E. 2d 522, 529 (1948), the court, which placed strong emphasis on factors of fairness, rejected the "interest or expectancy" test and declared:

"We do not concur in the argument of counsel for the defendant to the effect that the test is whether the corporation has an existing interest or an expectancy thereof in the property involved, being of the opinion that *the true basis of the governing doctrine rests fundamentally on the unfairness in the particular circumstances of a director, whose relation to the corporation is fiduciary, 'taking advantage of an opportunity [for his personal profit] when the interest of the corporation justly calls for protection. This calls for the application of ethical standards of what is fair and equitable * * * [in] particular sets of facts.'* Ballantine on Corporations (Rev. ed. 1946) 204-205." (Italics supplied.)

In an effort hopefully to ameliorate the often-expressed criticism that the doctrine is vague and subjects today's corporate management to the danger of unpredictable liability, we believe a more helpful approach is to combine the "line of business" test with the "fairness" test and to adopt criteria involving a two-step process for determining the ultimate question of when liability for a wrongful appropriation of a corporate opportunity should be imposed. The threshold question to be answered is whether a business opportunity presented is also a "corporate" opportunity, i.e., whether the business opportunity is of sufficient importance and is so closely related to the existing or prospective activity of the corporation as to warrant judicial sanctions against its personal acquisition by a managing officer or director of the corporation. This question, necessarily one of fact, can best be resolved, we believe, by resort to a flexible ap-

plication of the "line of business" test set forth in Guth v. Loft, Inc. *supra*. The inquiry of the factfinder should be directed to all facts and circumstances relevant to the question, the most significant being: Whether the business opportunity presented is one in which the complaining corporation has an interest or an expectancy growing out of an existing contractual right; the relationship of the opportunity to the corporation's business purposes and current activities—whether essential, necessary, or merely desirable to its reasonable needs and aspirations—; whether, within or without its corporate powers, the opportunity embraces areas adaptable to its business and into which the corporation might easily, naturally, or logically expand; the competitive nature of the opportunity—whether prospectively harmful or unfair—; whether the corporation, by reason of insolvency or lack of resources, has the financial ability to acquire the opportunity; and whether the opportunity includes activities as to which the corporation has fundamental knowledge, practical experience, facilities, equipment, personnel, and the ability to pursue. The fact that the opportunity is not within the scope of the corporation's powers, while a factor to be considered, should not be determinative, especially where the corporate fiduciary dominates the board of directors or is the majority shareholder.

If the facts are undisputed that the business opportunity presented bears no logical or reasonable relation to the existing or prospective business activities of the corporation or that it lacks either the financial or fundamental practical or technical ability to pursue it, then such opportunity would have to be found to be noncorporate as a matter of law. If the facts are disputed or reasonable minds functioning judicially could disagree as to whether the opportunity is closely associated with the existing or prospective activities of the corporation or its financial or technical ability to pursue it, the question is one of fact with the burden of proof resting upon the party attacking the acquisition.

Absent any evidence of fraud or a breach of fiduciary duty,

if it is determined that a business opportunity is not a corporate opportunity, the corporate officer should not be held liable for its acquisition. If, however, the opportunity is found to be a corporate one, liability should not be imposed upon the acquiring officer if the evidence establishes that his acquisition did not violate his fiduciary duties of loyalty, good faith, and fair dealing toward the corporation. Thus the second step in the two-step process leading to the determination of the ultimate question of liability involves close scrutiny of the equitable considerations existing prior to, at the time of, and following the officer's acquisition. Resolution will necessarily depend upon a consideration of all the facts and circumstances of each case considered in the light of those factors which control the decision that the opportunity was in fact a corporate opportunity. Significant factors which should be considered are the nature of the officer's relationship to the management and control of the corporation; whether the opportunity was presented to him in his official or individual capacity; his prior disclosure of the opportunity to the board of directors or shareholders and their response; whether or not he used or exploited corporate facilities, assets, or personnel in acquiring the opportunity; whether his acquisition harmed or benefited the corporation; and all other facts and circumstances bearing on the officer's good faith and whether he exercised the diligence, devotion, care, and fairness toward the corporation which ordinarily prudent men would exercise under similar circumstances in like positions. Minn. St. 301.31.

We are not to be understood, by adopting this two-step process, as suggesting that a finding of bad faith is essential to impose liability upon the acquiring officer. Nor, conversely, that good faith alone, apart from the officer's fiduciary duty requiring loyalty and fair dealing toward the corporation, will absolve him from liability. And it must be acknowledged, in adopting corporate opportunity doctrine expanded beyond the narrow preexisting property interest or expectancy standard, that there can be cases where the officer's personal seizure of an opportunity so

clearly essential to the continuance of a corporation or so intimately related to its activities as to amount to a direct interference with its existing activities would negate any attempt by the officer to prove his good faith, loyalty, and fair dealing.

The burden of proof on the questions of good faith, fair dealing, and loyalty of the officer to the corporation should rest upon the officer who appropriated the business opportunity for his own advantage. Such a burden necessarily lies with the acquiring officer because a fiduciary with a conflict of interest should be required to justify his actions and because of the practical reality that the facts with regard to such questions are more apt to be within his knowledge. See, McCormick, Evidence (2 ed.) § 337.

Applying our interpretation of the doctrine of corporate opportunity to this case, we have no difficulty in affirming the trial court's determination that defendants Rudolph and Benjamin did not wrongfully appropriate to defendant corporations or to themselves any corporate opportunity properly belonging to Miller Waste. The question of whether the businesses of Melamine Plastics Corporation, Fiberite Corporation, Miller Lubricator Company, Miller-Felpax Corporation, and the business of manufacturing the "filter element cartridges" by Filter Supply Corporation, were in the line of business of Miller Waste is a disputed question of fact and clearly the trial court's findings that each was not have ample evidentiary support. Similarly, the findings that defendants Rudolph and Benjamin diverted from Miller Waste corporate opportunities transferred to Unit and Filter Supply are sustained by the evidence and are, in our view, consistent with the proper application of the standards to be applied in determining the question of whether a business opportunity presented to a corporate fiduciary is a corporate opportunity.

Apart from the trial court's findings with respect to ratification, nonliability of defendants Rudolph and Benjamin and defendant Filter Supply Corporation is justified by findings of the trial court that the transfer to Unit Manufacturing Company of the mop manufacturing and welding business which Miller

Waste had acquired to facilitate Joseph's retirement was not significant to the business of Miller Waste; that the transfers and appropriations of the small packaging businesses and the manufacture and sale of the "filter element socks," found diverted, benefited and did not harm the corporation; that no corporate assets or facilities were used or exploited; that such diversions were made in good faith without concealment from the contingent beneficiaries and after full disclosure to and with the acquiescence, if not the approval, of all the then officers and shareholders of Miller Waste.

It may be observed that inferences from the facts as found by the court (disregarding the finding of consent to develop the patented lubricator) arguably would have justified the trial court's finding that the business of defendant Miller-Felpax Corporation and Miller Lubricating Company were in the line of business of Miller Waste, and thus a corporate opportunity of the waste mill.

Liability for such diversion would not be warranted however because, under the facts as found, the conclusion by the court that Rudolph and Benjamin discharged their fiduciary duties of good faith, loyalty, and fair dealing is compelling. In addition to the court's findings justifying the diversions found as summarized above, the unrefuted testimony at trial establishes that Rudolph and Benjamin, devoting their best efforts, worked exceedingly long hours at the waste mill; developed new lines of business for it, such as the sale of cotton "cuttings" and the division of plastic trading; loaned Miller Waste money when it needed financial assistance; and transacted all intercorporate activities at a profit to Miller Waste. No corporate assets were used in establishing any of defendant corporations, their activities were fully disclosed, and most important, Miller Waste was supplied with a captive market which has sustained the corporation and made it the "number one waste mill in the United States."

We must conclude therefore, based upon the record, that de-

fendant brothers, by embracing business opportunities and as a result advancing their own self-interest, were not unfair, did not act in bad faith, and did not violate their duty of loyalty to Miller Waste. Accordingly, plaintiff's complaint was properly dismissed.

Affirmed.

MR. CHIEF JUSTICE SHERAN, MR. JUSTICE YETKA, and MR. JUSTICE SCOTT, not having been members of this court at the time of the argument and submission, took no part in the consideration or decision of this case.