**TRIPLE FIVE OF MINNESOTA, INC., a Minnesota corporation, Plaintiff,**

v.

**Melvin SIMON; Herbert Simon; Randolph Foxworthy; Melvin Simon & Associates, Inc., an Indiana corporation; Si–Minn Limited Partnership, an Indiana limited partnership; Si–Minn, Inc., an Indiana corporation; David Simon; Simon Property Group, Inc., a Delaware Corporation; Simon Property Group L.P., a Delaware limited partnership; MS Management Associates, Inc., an Indiana corporation; Simon Management Associates, Inc., an Indiana corporation; Mall of America Associates, a Minnesota general partnership; MOAC Limited Partnership, a Minnesota limited partnership; Mall of America Compa-**

ny, a Minnesota general partnership; Minntertainment Associates, a Minnesota general partnership; Minntertainment Company, a Minnesota general partnership; MOAC Mall Holdings LLC; MOA Land Holdings LLC, MOA Entertainment Company LLC; and Does 1 to 20; Defendants.

No. CIV.99–1894 PAM/RLE.

United States District Court,
D. Minnesota.

Sept. 10, 2003.

See, also, 2002 WL 1949745.

Roger James Magnuson, Christopher T. Shaheen, Mitchell Widell Granberg, Todd Robert Trumpold, Dorsey & Whitney, Minneapolis, MN, Creighton Reid Magid,

Dorsey & Whitney, Washington, DC, for Plaintiff.

Thomas S. Fraser, James E. Dorsey, Gregory Elan Karpenko, Fredrikson & Byron, Minneapolis, MN, John M. Sheran, Lawrence Jeffrey Field, Leonard Street and Deinard, Minneapolis, MN, Richard L. Posen, Steven H. Reisberg, Tariq Mundiya, Willkie Farr & Gallagher, New York City, Monica L. Davies, Elizabeth Wiet Reutter, Leonard Street and Deinard, Minneapolis, MN, for defendants.

## MEMORANDUM AND ORDER

MAGNUSON, District Judge.

This matter was tried to the Court during June, July, and August 2003. The bench trial was confined to Plaintiff's claim for breach of fiduciary duty (Compl. Count I), as well as the Counts of the Complaint seeking the equitable remedies of accounting (*id.* Count VI), rescission (*id.* Count VII), constructive trust (*id.* Count VIII), and specific performance (*id.* Count IX). The parties also tried the issue of the appropriate remedies and damages for the breach of fiduciary duty claim to the Court.[1]

## FACTS

Plaintiff Triple Five of Minnesota, Inc. ("Triple Five") is the originator of the idea behind the Mall of America in Bloomington, Minnesota. Triple Five is owned by four brothers: Raphael, Nader, Bahman, and Eskander Ghermezian. The Ghermezians also developed and own and manage the West Edmonton Mall in Edmonton, Alberta, Canada. The West Edmonton Mall is the biggest indoor retail and entertainment complex in the world.

1. Triple Five has dropped its claims for breach of the settlement agreement (Compl. Count X) and fraud in the inducement of the settlement agreement (*id.* Count XI). In a previous Order, the Court dismissed Triple Five's claim under the Racketeer Influenced and Corrupt Organizations Act (*id.* Count XII).

In 1986, Triple Five secured the development rights for the land on which the Mall of America (the "Mall") is now situated. However, Triple Five had difficulty obtaining financing for the Mall project, as well as closing on some anchor tenants for the Mall. Defendants Melvin and Herbert Simon became involved in the project in 1987. At the same time, Teachers Insurance and Annuity Association ("Teachers") agreed to provide financing for the project, eventually paying $650 million in construction financing. After construction was completed, Teachers converted this financing into an equity investment in the Mall. In return for its investment, Teachers received an equity interest in Mall of America Company LP ("MOAC LP"), which is the managing partner and owner of 99% of Mall of America Company ("MOAC"). MOAC is the company that owns the Mall. MOAC LP is a partnership between Teachers, which owns 55% of MOAC LP, and Mall of America Associates ("MOAA"), which owns 45%. MOAA is a 50/50 partnership between Si–Minn Developers Limited Partnership ("Si–Minn LP") and Triple Five. Si–Minn LP is the managing partner of MOAA. Si–Minn LP is comprised of a general partner, Si–Minn, Inc., and limited partners in the form of members of the Simon family, including Defendants Melvin and Herbert Simon. Si–Minn, Inc. is a wholly-owned subsidiary of Melvin Simon & Associates, Inc. These same parties owned similar percentage interests in the entertainment portion of the Mall, called Minntertainment Associates ("Minntertainment").

The present dispute arose out of the October 1999 sale of 50% of Teachers' interest in MOAC and Minntertainment. This interest was purchased by the Simon Property Group, LP, an umbrella partnership real estate investment trust ("UPREIT"), of which the operating general partner is Simon Property Group, Inc. ("SPG").[2] SPG is a publicly traded real estate investment trust ("REIT"). Members of the Simon family and corporate entities controlled by the Simon family own slightly more than 21% of the shares of SPG. Melvin and Herbert Simon are co-chairmen of all of the Simon family entities involved in this litigation. Defendant David Simon is Melvin Simon's son and is the CEO or Executive Vice President of these entities. Defendant Randall Foxworthy is the Executive Vice President for Corporate Development of these entities.

Although the ownership of the Mall was split almost evenly between Teachers and MOAA, Teachers received all, or substantially all, of the profits from the Mall. According to the parties' various agreements, because Teachers had supplied the equity for constructing the Mall, Teachers had a preference in any profits generated by the Mall. This preference took the form of a $683 million capital account. Teachers was guaranteed an eight-and-one-half percent annual return on this capital account, or approximately $58 million per year. Any income over and above the first $58 million would be split again among the parties, with Teachers once again having a preference for a percentage of this income. It is not disputed that the Mall has never generated $58 million in annual income and that, as a result, Teachers has always received the entire income generated by the Mall.

Teachers' capital account also guaranteed that Teachers would be paid back for the money it put into the Mall if the Mall were ever sold or otherwise financed. For example, if the Mall were sold for $700 million, Teachers would be entitled to $683 million, with the remaining $17 million divided among the partners. If the Mall were sold for less than $683 million, Teach-

---

2. SPG was formerly known as the Simon De- Bartolo Group, or SDG.

ers would receive the entire purchase price and MOAA would receive nothing.

MOAA was not without income from the Mall, however. Because MOAA was the manager of the Mall, it received a management fee of 5% of the Mall's gross income per year. It is not disputed that this management fee was above the market rate for shopping center management fees. Si–Minn LP, who was the actual manager of the Mall, received 80% of this fee and Triple Five, who had no day-to-day responsibility for managing the Mall, received 20%.

In addition to the income advantage described above, Teachers also had strategic advantage over MOAA. The parties' agreements provided that, after 2002, Teachers could force MOAA either to buy the Mall at a price set by Teachers or to allow Teachers to sell the Mall at a price set by Teachers. (Ex. 74 at 136, § 7.3 (MOAC LP partnership agreement).) The effect of this provision was to allow Teachers to assume ownership of the entire Mall, because it could set the sale price at a number that MOAA could not meet and then buy the asset itself, essentially taking money out of one pocket and putting it into the other. The agreements also provided that, if the partners were unable to agree on any matter material to the operation of the Mall, Teachers could trigger the same buy-sell provision. (*Id.* at 139, § 7.4.) This provision was not limited to events occurring after 2002 but could be triggered at any time.

The 1999 sale of 50% of Teachers' interest entailed a rather complicated series of transactions. First, the assets of MOAC[3] and Minntertainment were transferred to

two holding companies, MOAC Mall Holdings LLC and MOA Entertainment Company LLC.[4] The holding companies then received a $312 million mortgage on the Mall from Chase Manhattan Bank. Teachers was paid $303.5 million in cash from this mortgage. SPG received fees from the mortgage in the amount of $3.12 million. SPG then paid Teachers $84.5 million in cash and in return received 50% of Teachers' interest, including Teachers' capital account and income preferences. However, the capital account was reduced by the net amount of the mortgage, resulting in a capital account of $371 million, or $185.5 million each for Teachers and SPG. The income preference from this capital account remained at eight-and-one-half percent, or slightly more than $31.5 million annually. SPG also shared Teachers' preference in any remaining income. SPG and Teachers further agreed that Teachers could not sell more than 50% of its remaining interest in the Mall prior to 2004 without the consent of SPG. Finally, as part of the transaction Teachers purchased $25 million worth of shares of SPG preferred stock.

Triple Five contends that the transaction itself, including the financing fee paid to SPG, the mortgage on the previously unencumbered Mall, and Teachers' purchase of SPG preferred stock violated Defendants' fiduciary duty to their partner Triple Five. The breach of fiduciary duty claim is not based solely on the structure or fact of the transaction, however. Triple Five also claims that Defendants concealed the negotiations surrounding the transaction from Triple Five and actively misled Triple Five about Defendants' intent to

---

**3.** MOAC's interest in the so-called Met Center property adjacent to the Mall was not included in this asset transfer. However, the Met Center property, formerly owned by MOAC, was transferred to a new single-purpose limited liability company called MOAC Land Holdings LLC. This company is wholly owned by MOAC.

**4.** MOAC Mall Holdings LLC is wholly owned by MOAC. MOA Entertainment Company LLC is wholly owned by Minntertainment.

enter into the transaction with Teachers. Triple Five points to letters, taped telephone conversations, and e-mails that it claims establish that Defendants did not want Triple Five to know enough about the transaction, in violation of Defendants' fiduciary duties to Triple Five.

Defendants maintain that the transaction not only did not injure Triple Five, but actually benefitted Triple Five because it forestalled Teachers' sale of the Mall and MOAA's consequent loss of the management fee. Defendants claim that, to the extent that any of them owed a fiduciary duty to Triple Five, they fully complied with that duty.

## BREACH OF FIDUCIARY DUTY CLAIM

Triple Five contends that Defendants breached their fiduciary duties to Triple Five in three distinct ways. First, Triple Five argues that Defendants usurped an opportunity that should have been offered either to MOAA or to Triple Five. (Pl.'s 2d Am. Proposed Findings of Fact & Conclusions of Law at 42 (hereinafter "Pl.'s 2d Am. Findings").) Next, Triple Five contends that Defendants failed to disclose material information to Triple Five. (*Id.* at 47.) Finally, Triple Five contends that the Simons behaved in an intimidating and threatening manner toward Triple Five. (*Id.* at 50.) The parties do not dispute that, in Minnesota, the law imposes on each partner "the highest standard of integrity and good faith in their dealings" with their partners. *Venier v. Forbes*, 223 Minn. 69, 25 N.W.2d 704, 708 (1946). Nor do the parties dispute the elements of the broad fiduciary duty, such as the duty to disclose information, *see Klein v. First Edina Nat'l Bank*, 293 Minn. 418, 196 N.W.2d 619, 622 (1972), the duty to consult, *see Yorks v. Tozer*, 59 Minn. 78, 60 N.W. 846, 847 (1894), and the duty to account to the partners for any benefit received and hold that benefit in trust, *see* Minn.Stat.

§ 323.20. The disagreement in this case first centers on which Defendants may be considered partners for the purposes of imposing fiduciary duties, and then on whether those Defendants breached their fiduciary duties.

### A. Who Owed a Duty

Defendants contend that, because only Si–Minn LP signed the MOAA partnership agreement with Triple Five, only Si–Minn LP is Triple Five's partner and only Si–Minn LP owed Triple Five any fiduciary duties. In addition to Si–Minn LP, Triple Five seeks to hold Melvin Simon, Herbert Simon, Randolph Foxworthy, Melvin Simon & Associates, Inc., Si–Minn, Inc., MOAA, Minntertainment, and MOAC LP liable for breach of fiduciary duty. (*See* Compl. at 24) ("*COUNT I—BREACH OF FIDUCIARY DUTY* (Against the Simon Defendants[,] MOAA, Minntertainment and MOAC Limited Partnership;") *see also* Compl. ¶¶ 17, 19 (defining "Simon Defendants" as Melvin and Herbert Simon, Randolph Foxworthy, Si–Minn LP, Si–Minn, Inc., and Melvin Simon & Associates).) Triple Five also argued in the court trial that David Simon, SPG, SPG LP, MOAC, MOAC Mall Holdings LLC and MOA Land Holdings LLC are liable for the claimed breaches of fiduciary duties. (Pl.'s 2d Am. Findings at 40, ¶ 4; 41–42, ¶ 7.) However, because Count I of the Complaint does not name any of these people or entities, Triple Five cannot make out a claim against them, even though Triple Five proved that some or all of these entities did in fact owe Triple Five a fiduciary duty.

As noted above, there is no dispute that Si–Minn LP, as the managing general partner of MOAA, owed Triple Five a fiduciary duty. That fiduciary duty may be imputed to officers and directors of the general partner company. *O'Leary ex*

*rel. Lakeland Printing Co. v. Carefree Living of Am.*, No. C5–00–2072, 2001 WL 1083757, (Minn.App. Sept. 18, 2001). "[O]fficers and directors of a corporate general partner can be held personally liable to the limited partners in the circumstances of a violation of fiduciary duty." *Vincent v. Beck*, No. C6–94–2636, 1995 WL 541470 at *2 (Minn.App. Sept. 12, 1995). As Professor DeMott explained, the standards of conduct for managing partners "apply to those persons or those entities who have or hold themselves out as having authority or the right to take action with regard to the partnership." (Tr. at 594.) Thus, Melvin Simon, Herbert Simon, and Randolph Foxworthy, both by virtue of their positions as officers of Si–Minn LP and by holding themselves out as having the authority to take action for MOAA, also owed Triple Five a fiduciary duty. Similarly, Si–Minn, Inc., as the general partner of Si–Minn LP, owed Triple Five a fiduciary duty.

Under Minnesota law, a partnership is liable for the wrongful acts or omissions of a partner. *See* Minn.Stat. § 323A.3–05; *Sage Co. v. Ins. Co. of N. Am.*, 480 N.W.2d 695, 698 (Minn.Ct.App.1992). Thus, Minntertainment and MOAA can be liable for the alleged breaches of fiduciary duties of Si–Minn LP. Similarly, MOAC LP can be liable for the wrongful acts of its partner, MOAA.

Melvin Simon & Associates, Inc. is not a partnership and thus is not subject to the rule expressed above. However, the evidence establishes that Herbert Simon and Randolph Foxworthy committed breaches of their fiduciary duties to Triple Five while acting on behalf of Melvin Simon & Associates. Indeed, the evidence shows that Defendants did not differentiate among the various closely held Simon family entities, and the Court will not do so. Thus, Melvin Simon & Associates may be liable for Herbert Simon and Randolph Foxworthy's breaches of fiduciary duty.[5]

### B. Merits of Claim

■ Defendants make much of a clause in the MOAA partnership agreement that provides that no partner shall be liable to any other partner except in the case of fraud or gross negligence. (Ex. 28 at 48, Art. XI(H).) Defendants contend that, unless the Court finds fraud or gross negligence, Defendants are not liable to Triple Five even if the Court otherwise finds a breach of fiduciary duty. The Court agrees with Defendants that the conduct alleged in this case does not rise to the level of fraud or gross negligence. However, even if the MOAA partnership agreement prohibits contractual liability, the existence of that clause in the agreement does not affect the analysis of Triple Five's breach of fiduciary duty claim. "While 'partners are free to vary many aspects of their relationship ... they are not free to destroy its fiduciary character.'" *Appletree Square I Ltd. Partnership v. Investmark*, Inc., 494 N.W.2d 889, 893 (Minn. App.1993) (quoting *Saballus v. Timke*, 122 Ill.App.3d 109, 77 Ill.Dec. 451, 460 N.E.2d 755, 760 (1983)). Thus, regardless of the limitations set forth in the parties' contract, Defendants owed Triple Five various common-law fiduciary duties and Defendants can be liable for the breach of those duties.

#### 1. *Duty to Disclose*

"Each partner has a duty to render to any partner on demand true and full information as to all things affecting the partnership." 36 Dunnell Minn. Digest Part-

---

5. The Court will hereinafter refer collectively to those Defendants who owed Triple Five a fiduciary duty as "Defendants."

nership § 4.01(c) (4th ed.1997); *see also* Minn.Stat. § 323.19. Partners may not alter this duty by contract. *Appletree Square,* 494 N.W.2d at 892. Moreover, a partner has a "broad common law duty to disclose all material facts," whether requested to do so or not. *Id.*

Triple Five contends that Defendants breached the duty to disclose in a number of ways. First, Triple Five asserts that Defendants concealed their negotiations with Teachers from Triple Five and actively misled Triple Five into believing that Defendants were not negotiating with Teachers. Second, Triple Five alleges that, after Triple Five learned of the transaction, Defendants refused to disclose material details about the transaction.

### a. *Failure to disclose negotiations*

Triple Five argues that Defendants breached their fiduciary duties to Triple Five in part by failing to disclose the fact that SPG was pursuing and negotiating a deal with Teachers. Both parties were aware in March of 1998 that Teachers was considering a sale of all or part of its interest in the Mall. Teachers wrote about its intentions to MOAA in early March 1998. Herbert Simon responded with a letter to Teachers on March 6, 1998, and blind copied this letter to Triple Five. (Ex. 11.) This letter acknowledged Teachers' desire to sell part of the Mall but did not mention any potential acquisition by SPG. Indeed, the tone of the letter is almost adversarial, warning Teachers that the interests of both Si–Minn and Triple Five should be considered or that MOAA would seek to enforce its rights to prevent a sale under the parties' agreements. This letter, according to Triple Five, lulled Triple Five into thinking that Defendants were protecting Triple Five's interests and were not pursuing any deal with Teachers. At the same time, however, Randolph Foxworthy had started to discuss with the Simons and others a potential structure

for SPG's purchase of Teachers' interest. (*See* Ex. 476 (Mar. 16, 1998, e-mail from R. Foxworthy to B. Gobeyn of SPG)) ("[W]e need to do a real acquisition analysis" for purchase of Teachers' interest by SPG); Ex. 477 (Apr. 13, 1998, e-mail from R. Foxworthy to D. Simon, et al. ("I have looked again at a structure for the purchase of MOA."); Ex. 2 (Apr. 29, 1998, memo from R. Foxworthy to Herbert Simon, et al., re: valuation of Mall for potential purchase by SPG).) No one communicated the substance of any of these discussions to Triple Five.

At the July 1998 MOAC partnership meeting, Teachers announced that it was actively marketing the sale of its interest. After the meeting, an employee of Triple Five who had attended the meeting, Shawn Samson, had a lengthy conversation with Randolph Foxworthy, who had not attended the meeting. During this conversation Mr. Foxworthy assured Mr. Samson that the Simons were not interested in pursuing a deal with Teachers. (Ex. 70 (R. Foxworthy's notes of conversation).) However, the day before this conversation, Mr. Foxworthy sent an e-mail to Melvin, Herbert, and David Simon, among others, in which he outlined a possible structure for a deal between SPG and Teachers. (Ex. 3.) Indeed, as outlined above, Defendants had been discussing a possible deal between SPG and Teachers as early as March 1998. With one exception, Defendants' discussions did not hypothesize any involvement by Triple Five in this transaction. (Ex. 61 (Dec. 7, 1998, e-mail from R. Foxworthy to H. Simon re: acquisition of Mall by SPG, including Triple Five's participation in transaction).)

According to Defendants, these discussions were mere "musings" and actual negotiations between SPG and Teachers did not begin until after a meeting between SPG and Teachers in late January 1999.

At this meeting, Teachers allegedly announced that Teachers wanted SPG to purchase 50% of Teachers' interest. Triple Five did not attend this meeting and was never informed that the meeting took place. In fact, Triple Five was not aware until April 1999 that SPG was negotiating with Teachers at all. On April 14, 1999, Herbert Simon sent a letter to Raphael Ghermezian to inform Triple Five that SPG was planning to enter into transactions with Teachers to purchase 50% of Teachers' interest in the Mall. (Ex. 502.) This letter, sent on Si–Minn, Inc. letterhead, was "intended to inform [Triple Five] of the borrowing transaction being pursued as required by the Partnership Agreements ... and to apprise you of the concurrent transaction to be entered into between [Teachers] and SPG." (*Id.* at 2.) The letter makes clear that it is the Simons, whether through Si–Minn, Inc. or another entity, who were entering into the deal with Teachers, stating that after Teachers announced its intention to sell its interest "*we* began to investigate avenues" to meet Teachers' needs. (*Id.* at 1 (emphasis added).) The letter describes the transaction in general terms and although the language used is couched in the future tense—for example, "it is currently anticipated that the borrowing would be in the amount of approximately $310MM"—it is clear that the details of the transaction had been fully negotiated. As the letter states, "[i]t is currently estimated that all of these transactions will close prior to June 30th," less than six weeks from the date of the letter. (*Id.*) Defendants admitted that it takes four to six months to negotiate and close a transaction of this nature.

■ Defendants contend that their conduct did not breach their duty to disclose information to Triple Five. Their argument is that SPG was the entity that negotiated and eventually accomplished the deal with Teachers and SPG did not owe Triple Five any fiduciary duties. Defen-

dants cannot hide behind corporate formalities. As discussed above, most of the individual Defendants, including Melvin and Herbert Simon and Randy Foxworthy, owed a fiduciary duty to Triple Five. These Defendants, in particular Mr. Foxworthy, were instrumental in structuring and negotiating the deal with Teachers. Moreover, Defendants themselves did not separate their various corporate entities. They used letterhead from the various companies interchangeably and did not inform Triple Five or Teachers that they were acting solely on behalf of one entity or another. It was reasonable for Triple Five to believe that the individual Defendants would act consistently with their fiduciary duties to Triple Five, whether they were acting for Si–Minn or SPG. Those fiduciary duties required Defendants to disclose to Triple Five the fact that they were negotiating on behalf of SPG for the purchase of 50% of Teachers' interest in the Mall. Defendants' failure to disclose those negotiations constitutes a breach of their fiduciary duty to their partner, Triple Five.

b. *Failure to disclose details of transaction*

■ Next, Triple Five contends that, after the April 14, 1999, letter and despite repeated requests by Triple Five, Defendants refused to disclose to Triple Five any of the material details of the transaction. The evidence shows that Triple Five requested information from Defendants on numerous occasions. On May 5, 1999, in response to the April 14 letter, Nader Ghermezian wrote to Herbert Simon. (Ex. 40.) In that letter, Mr. Ghermezian made requests for information about the transaction, including a request that Triple Five receive the information provided to lenders. (*Id.* at 2.) Randolph Foxworthy responded to Mr. Ghermezian's request on May 7, 1999. (Ex. 16.) This letter chided

Mr. Ghermezian for "believ[ing] what is printed in news reports" and told Mr. Ghermezian that "[n]o formal packages" had been sent to lenders. (*Id.* at 3.) The evidence demonstrated, however, that Defendants had sent information to lenders and had received detailed information from lenders by this date. (*See* Ex. 501 (Apr. 13, 1999, memorandum from R. Foxworthy to D. Simon, H. Simon, M. Simon, stating that "[w]e have received term sheets from both Chase and Morgan Stanley").) Despite Triple Five's repeated requests for information, Defendants continued to insist that there was no information to give them. This insistence was patently false. (*See* Ex. 125 (June 9, 1999, memo from R. Foxworthy to J. Luik of Teachers comparing term sheets from Chase Manhattan Bank and Morgan Stanley Dean Witter).) Defendants failed to provide complete information about the transaction to Triple Five.

Defendants respond to Triple Five's evidence in several ways. First, they contend that they did disclose to Triple Five the material terms of the transaction and that Triple Five admitted that it knew the material terms. Next, they argue that Triple Five was not entitled to any details of the transaction but was only entitled to general information about the transaction, which information Defendants sent them in various letters. Finally, they contend that, because the transaction allegedly benefitted Triple Five, Triple Five was not injured by any alleged failure to disclose.

As outlined more fully above, the evidence establishes that Defendants did not disclose the material terms of the transaction to Triple Five. Defendants' reliance on a stray comment by Nader Ghermezian (*see* Ex. 232B at 17 ("Forget about the transaction, we know what's in there.")) is misplaced. In light of the series of requests for information by Triple Five and Defendants' repeated refusal to provide

any specific information about the transaction, this comment cannot be construed as an admission that Triple Five was aware of all of the material terms of the transaction.

It is also clear that Defendants should have provided specific information regarding the transaction to Triple Five. As fiduciaries, Defendants were obligated to provide Triple Five with all material information, whether or not Triple Five requested that information. *Appletree Square*, 494 N.W.2d at 892. Material information includes specific and complete information about the details of the transaction and would have included providing Triple Five with the term sheets from lenders, among other information.

Finally, Defendants' assertion that Triple Five was not injured by any alleged failure to provide complete information is disingenuous. As discussed more fully with respect to Triple Five's usurpation claim, Defendants insist that Triple Five cannot now complain about the transaction because Defendants repeatedly offered to allow Triple Five to participate in the transaction by purchasing half of what SPG was purchasing. These offers were unaccompanied by any specific information about the details of the transaction, however, making it impossible for Triple Five to either understand the offer or respond to the offer. Moreover, Defendants demanded that Triple Five respond to the offers and come up with money for the transaction within an unreasonably short period of time, when Defendants knew that securing financing for a transaction of the magnitude of the Teachers' deal, even with full information about that transaction, could take months. Defendants' purported offers were not legitimate offers and Triple Five was fully justified in refusing to respond to those offers.

Defendants' failure to provide Triple Five with information about the transac-

tion prevented Triple Five from participating in the transaction and thereby injured Triple Five. Triple Five has established that Defendants owed Triple Five a duty to disclose and that Defendants breached that duty.

2. *Usurpation of Partnership Opportunity*

■ Triple Five claims that Defendants breached their fiduciary duties by usurping an opportunity that should have been offered to MOAA or to Triple Five. In the ruling on the Motions in Limine, the Court mistakenly conflated two predicates for establishing whether the opportunity was in fact a partnership opportunity: financial ability and refusal to deal. In that Order, the Court stated that both financial ability and refusal to deal were equitable defenses to a claim of usurpation of partnership opportunity, and held that Defendants were precluded from raising these defenses unless Defendants could first prove that the opportunity and the refusal to deal were both unambiguously disclosed to Triple Five. This was erroneous.

A court must consider a partner's financial ability to pursue the alleged partnership opportunity when determining whether the opportunity was indeed a partnership opportunity in the first instance. *Miller v. Miller,* 301 Minn. 207, 222 N.W.2d 71, 81 (1974). Lack of financial ability is not an equitable defense. Rather, to the extent that it is at issue, financial ability must be established at the outset. This is in contrast to the refusal-to-deal defense, which is an equitable defense that a party can assert only if the refusal to deal was unambiguously disclosed and if the refusal was not a result of any nefarious actions on the part of the partner asserting the defense. (Order of Aug. 12, 2002, at 7) (citing *Regal–Beloit Corp. v. Drecoll,* 955 F.Supp. 849, 862 (N.D.Ill.1996).)

The Court's error, however, has no practical effect in this case. The parties each put forward evidence on Triple Five's financial ability. This evidence shows that Triple Five could have purchased either the entire interest SPG purchased or one-half of the interest SPG purchased. In particular, the Court credits the testimony of Martin Walrath, one of Triple Five's chief financial officers. Mr. Walrath's testimony establishes that Triple Five had good relationships with several banks, that Triple Five owned property with which Triple Five could have secured a substantial loan, and that Triple Five had cash on hand in 1999 to put into a transaction. All of these factors show that Triple Five had the financial ability to pursue the 1999 Teachers' transaction. It is clear that the opportunity also meets many of the remaining *Miller* factors. *See Miller,* 222 N.W.2d at 81 (listing factors such as whether opportunity is related to partnership's business purposes and activities, whether opportunity is in an area in which the partnership might logically expand, and whether opportunity includes matters as to which the partnership has fundamental knowledge). Thus, Triple Five has established that the opportunity was a partnership opportunity.

Defendants argue that, even if the 1999 transaction was a partnership opportunity, Triple Five's usurpation claim fails because Teachers refused to deal with Triple Five. As noted above, a party may assert the refusal-to-deal defense only when the party can establish that the refusal was communicated to the partner and was not a result of any nefarious actions on the part of the person asserting the defense.

In this case, there is no evidence that Teachers refused to deal with Triple Five prior to June 1999, when the transaction was finalized by the approval of Teachers' investment committee. All of the commu-

nications regarding Teachers' unwilling-ness to deal with Triple Five occurred well after the terms of the deal were final and thus well after the time when Triple Five could legitimately have participated in the transaction. The evidence shows that, at least as late as December 1998, Teachers considered that Triple Five might be in-volved in a future sale of Teachers' inter-est in the Mall. (Ex. 275 at S11491 (A. Spellmeyer's notes of Dec. 1998 partner-ship meeting); Ex. 61 (Dec. 7, 1998, e-mail from R. Foxworthy to H. Simon).).). The Court finds the testimony of Joe Luik incredible on this point. Putting aside Mr. Luik's adamant and unbelievable assertion that Teachers would never deal with Triple Five, there is no evidence that, prior to the investment committee's approval of the transaction, Teachers would have refused to deal with Triple Five. Moreover, Reggie Long of Teachers agreed after the transac-tion was finalized to allow SPG and Triple Five to enter into a side deal whereby Triple Five would purchase half of what SPG was buying from Teachers. Defen-dants cannot rely on an alleged after-the-fact assertion of a refusal to deal as a defense to the usurpation claim. Triple Five has therefore proved that Defen-dants' involvement in the Teachers' trans-action constituted a usurpation of a part-nership opportunity which was a breach of the fiduciary duties Defendants owed to Triple Five.

a. *Financing Fee*

 Triple Five also complains about the $3.12 million financing fee SPG re-ceived out of the proceeds of the mortgage. Triple Five takes issue both with the fact that the financing fee was paid and with the fact that Defendants did not disclose the existence of the financing fee to Triple Five. As previously discussed, Defendants failed to disclose many material details of the transaction to Triple Five and that failure breached Defendants' fiduciary duties to Triple Five. The fact that SPG was receiving a substantial financing fee from the mortgage transaction was a ma-terial detail that Defendants should have disclosed to Triple Five.

Moreover, the fact that SPG took a 1% financing fee from the transaction consti-tutes a breach of Defendants' fiduciary duties. It is undisputed that the partners of MOAC LP, including Triple Five, are bound to pay back the entire amount of the mortgage, including the amount of the financing fee. By taking $3.12 million from the mortgage proceeds, SPG took money out of the Mall that the remaining partners must pay back. The financing fee was unwarranted and SPG should not have accepted that fee. Because of SPG's wrongful retention of the financing fee, the Court finds that the price SPG paid for the Teachers' should be reduced by $3.12 mil-lion, to $81.38 million.

b. *$25MM Capital Account/Pari Pas-su Distribution*

Triple Five contends that Defendants breached their fiduciary duty by failing to distribute to Triple Five a pro-rata share of the mortgage proceeds based on the alleged existence of a $25 million capital account in favor of MOAA. The MOAC LP partnership agreement contemplated the possibility that partners other than Teach-ers might have a capital account. (Ex. 74 § 4.3(a)(iii).) However, the agreement states that other partners may have capital accounts if those partners have made con-tributions to the capital of the partnership. (*Id.*) Although there was testimony from both Shawn Samson and Randolph Fox-worthy about the $25 million capital ac-count, there was no evidence about how such a capital account arose. For in-stance, neither party established that ei-ther MOAA or Si–Minn or Triple Five made any contribution to capital that

would have necessitated the creation of a capital account under the relevant partnership agreement.

However, even assuming that a $25 million capital account in favor of MOAA existed, the evidence showed that such an account was not, as Triple Five insisted, to be distributed on a pari passu basis with Teachers' capital account. Indeed, the evidence Triple Five relies on for this point is at best ambiguous. Triple Five maintains that the pari passu distribution is reflected in Randolph Foxworthy's notes of a conversation he had with Shawn Samson on June 3, 1999. While these notes do show a discussion of the capital account and Mr. Samson's belief that the capital account was to be pari passu with Teachers' account, the notes also show that Mr. Foxworthy had a different interpretation of the status of the capital account. (Ex. 508 ("TIAA gets money first by my reading.").) This evidence does not establish that the MOAA capital account was pari passu with Teachers. Because this is the only evidence on this point, Triple Five has not established that the MOAA capital account stood on equal footing with Teachers' capital account. Thus, Triple Five's claims arising out of the failure to pay the MOAA capital account preferences are not supported by the evidence.

### 3. *Defendants' Conduct*

█ Finally, Triple Five argues that Defendants behaved in a belligerent manner towards Triple Five and that this conduct constitutes a breach of Defendants' fiduciary duty. It is true that the transcripts of the taped telephone conversations between Triple Five and certain Defendants contain examples of behavior that can best be characterized as boorish, behavior one might expect to see on a playground but not in dealings between sophisticated business partners. However, it is also true that Triple Five bears some responsibility for the strained relationship between the parties. For example, Triple Five was often very slow to respond to Defendants throughout their business relationship. Neither party has acted as a model of professionalism during their business relationship.

The Court again comments on the unseemly nature of this dispute. The Court, and to a large extent the general public, grow weary of corporations and the individuals who run them conducting their business affairs as if business expediency is the only consideration. Business people cannot and must not ignore ethics, fairness, and sound judgment when ordering their affairs. This case presents an example of a situation in which business expediency overshadowed the very high duties the law imposes on partners. Had Defendants taken seriously this duty when evaluating the transaction at issue, there is no doubt that the result of this litigation would be very different.

On the other hand, while Defendants' conduct undoubtedly breached fiduciary duties, much of the conduct was not as bad as Triple Five paints it. When you foster an atmosphere of mistrust by threatening litigation for every perceived wrong, you reap what you sow. A person who is mistrusted will often give you reason to mistrust. The Court has found in favor of Triple Five in this matter, but Triple Five is certainly not blameless. The Court again urges the parties to carefully consider their positions before proceeding any further.

## OTHER EQUITABLE CLAIMS

As noted at the outset, all of Triple Five's equitable claims were tried to the Court. However, Triple Five did not mention the equitable remedies of rescission and specific performance in its Second Amended Proposed Finding of Fact and Conclusions of Law. Thus, the Court will consider these equitable claims abandoned.

The remaining equitable claims, for an accounting and for a constructive trust, are in the nature of remedies rather than claims and will be included in the discussion of the remedy below.

## REMEDY

Triple Five has succeeded in establishing that Defendants breached their fiduciary duties to Triple Five. The Court must now determine whether money damages, an equitable remedy, or a combination of both, will fairly compensate Triple Five for Defendants' breach.

### A. Value of Mall

The parties presented voluminous evidence about the proper value of the Mall at the time of the 1999 transaction. Defendants' evidence consisted of contemporaneous valuations performed by entities such as Standard & Poors, Chase Manhattan Bank, Moody's Investor Service, and Cushman & Wakefield. Apart from the Cushman & Wakefield valuation, these valuations were not full appraisals of the Mall, but were instead simple valuations without any reference to capitalization rates or other information necessary to test the accuracy of such valuations. Thus, although the Court finds the Cushman & Wakefield appraisal valuation credible, the Court gives little weight to Defendants' remaining evidence on the value of the Mall. The Cushman & Wakefield report valued the Mall, including the Minntertainment component, at $583 million.

Triple Five's evidence on valuation took the form of an MAI appraisal conducted for the purposes of trial by Louis Frillman, an MAI appraiser with extensive knowledge of the Twin Cities' real estate market. Mr. Frillman testified that the value of the Mall, including Minntertainment, was approximately $750 million. Mr. Frillman further testified that, in 1999, the value of the Met Center site was approximately $50 million.

The Court finds that the Cushman & Wakefield valuation underestimated the value of the Mall and Minntertainment, and that Mr. Frillman's valuation overestimated the value of the Mall and Minntertainment. Having carefully reviewed the evidence, the Court determines that the value of the Mall and Minntertainment at the time of the 1999 transaction was $650 million. The Court further determines that the value of the Met Center site, together with the value of the tax increment financing ("TIF") notes, was $50 million. Thus, the total value of the opportunity usurped by Defendants was $700 million.

### B. Equitable Relief

■ Triple Five contends, and the Court agrees, that monetary damages will not adequately compensate Triple Five for Defendants' breaches of fiduciary duty. See Lewis v. Cocks, 90 U.S. (23 Wall.) 466, 23 L.Ed. 70 (1874) (party entitled to equitable relief where monetary damages are inadequate). Monetary damages will not accomplish what would have happened without the breaches of fiduciary duty, which is to give Triple Five the opportunity to participate in the transaction with Teachers. Further, aside from being prevented from participating in the transaction, Triple Five was not otherwise damaged by Defendants' breaches.

Accordingly, the Court will impose a constructive trust on that portion of the Mall currently owned by SPG. SPG must transfer its 27.5% interest in the Mall to Triple Five and must disgorge all net profits received as a result of this interest from 1999 to the present. These net profits include monies received from the sale of part of the Met Center site to IKEA. To receive SPG's interest, Triple Five must transfer to SPG $81.38 million, which represents the $84.5 million purchase price

less the $3.12 million financing fee. Triple Five must make this payment to SPG within nine months of the date of this Order.

In order to determine the amount of net profits SPG must disgorge to Triple Five, Triple Five is entitled to a full financial accounting from all Mall entities. In addition, the Court will appoint a Special Master to act as trustee over the constructive trust. The Special Master shall likewise be entitled to a copy of the documents Defendants make available to Triple Five as part of the accounting. The Special Master shall make the final determination on the amount of net profits that are to be paid to Triple Five, subject to any appeal to this Court.

The Court also finds that Defendants' failure to transfer to Triple Five its pro rata share of the stub period income and tenant allowance reserve funds was a breach of Defendants' fiduciary duties. Thus, Triple Five is entitled to its pro rata share of these funds. However, Triple Five is not entitled to a distribution of a portion of the mortgage proceeds. As the Court discussed previously, the evidence showed that to the extent MOAA has a capital account, that capital account does not stand on equal footing with Teachers' income and distribution preferences. Triple Five has no claim to the mortgage proceeds.

Because of the breaches of fiduciary duties perpetrated by Defendants, the Court finds it necessary to amend the partnership agreements to remove Si–Minn LP as the managing general partner of MOAA. The agreements shall be amended to provide that Triple Five is the managing general partner of MOAA. As managing general partner, Triple Five shall receive 80% of partnership distributions and Si–Minn LP shall receive 20%. Moreover, Defendants are enjoined from conducting any business activities relating

to the Mall outside the ordinary course of business without first consulting and receiving written consent from Triple Five. Triple Five shall not, however, unreasonably withhold its consent.

Finally, the Court finds that the breaches of fiduciary duty outlined above require Defendants to reimburse Triple Five for its reasonable attorneys' fees and costs in this matter. To the extent that the assets of MOAA, Minntertainment, MOAC, or other Mall entities were used to pay Defendants' attorneys' fees and costs, Defendants must reimburse these partnerships one-half of the amount withdrawn. The Special Master will determine the appropriate amount of attorneys' fees to be reimbursed both to Triple Five and to the partnerships.

## CONCLUSION

The Court finds in favor of Triple Five on its breach of fiduciary duty claims. Accordingly, **IT IS HEREBY ORDERED** that:

1. Triple Five is entitled to purchase from SPG the 27.5% interest in the Mall of America that SPG purchased from Teachers in 1999. Triple Five must remit to SPG $81.38 million within nine months of the date of this Order to receive that interest;

2. SPG must disgorge all net profits received as a result of SPG's ownership interest in the Mall of America from the 1999 transaction to the present, including profits received from the sale of a portion of the Met Center site to IKEA;

3. Defendants must transfer to Triple Five its pro rata share of the stub period income and the tenant allowance reserve funds;

4. Defendants must reimburse Triple Five for its reasonable costs and

attorneys' fees incurred in prosecuting this matter;

5. Triple Five shall replace Si–Minn LP as the managing general partner of MOAA, and as managing general partner, Triple Five shall receive 80% of partnership distributions and Si–Minn LP shall receive 20%;

6. All Defendants are hereby **ENJOINED** from conducting any business involving any aspect of the Mall outside the ordinary course of business without consulting with, receiving the written consent of, Triple Five; but Triple Five shall not unreasonably withhold its consent;

7. Defendants shall pay Triple Five's reasonable attorneys' fees and costs incurred in prosecuting this matter; and

8. To the extent that any Mall partnership paid Defendants' attorneys' fees and costs in this matter, Defendants must reimburse those entities one-half (50%) of those fees and costs.