

# Fourth Court of Appeals
## San Antonio, Texas

### CONCURRING OPINION

No. 04-12-00630-CV

**THE HUFF ENERGY FUND, L.P.**, WRH Energy Partners, L.L.C., William R. "Bill" Huff,
Rick D'Angelo, Ed Dartley, Bryan Bloom, and Riley-Huff Energy Group, LLC,
Appellants

v.

**LONGVIEW ENERGY COMPANY**,
Appellee

From the 365th Judicial District Court, Zavala County, Texas
Trial Court No. 11-09-12583-ZCVAJA
Honorable Amado J. Abascal III, Judge Presiding

Opinion by: Sandee Bryan Marion, Chief Justice
Concurring Opinion by: Marialyn Barnard, Justice
Dissenting opinion by: Luz Elena D. Chapa, Justice, joined by Rebeca C. Martinez, Justice
Concurring and Dissenting Opinion by: Patricia O. Alvarez, Justice

Sitting en banc:  Sandee Bryan Marion, Chief Justice
                Karen Angelini, Justice
                Marialyn Barnard, Justice
                Rebeca C. Martinez, Justice
                Patricia O. Alvarez, Justice
                Luz Elena D. Chapa, Justice
                Jason Pulliam, Justice

Delivered and Filed:  November 25, 2015

I join in the majority's judgment and agree with its analysis of appellants' complaints as to jury question two and the lis pendens issue.  However, I differ with the majority's analytical approach with regard to the resolution of appellants' complaints relating to jury question one, and

therefore concur in the judgment. I write separately only to set out the analysis I believe is mandated by the jury charge and applicable Delaware law.

## ANALYSIS

### *Delaware Substantive Law*

In Delaware, the corporate opportunity doctrine arose as a means of defining the parameters of a corporate director's fiduciary duty of loyalty owed to her corporation in instances of potential conflict. *See Broz v. Cellular Info. Sys., Inc.*, 673 A.2d 148, 154 (Del. 1996). The seminal Delaware case on the corporate opportunity doctrine is *Guth v. Loft, Inc.*, 5 A.2d 503 (Del. 1933). In *Guth*, the Delaware Supreme Court set out its view regarding the doctrine of corporate opportunity:

> [I]f there is presented to a corporate officer or director a business opportunity which the corporation is financially able to undertake, is, from its nature, in the line of the corporation's business and is of practical advantage to it, is one in which the corporation has an interest or a reasonable expectancy, and, by embracing the opportunity, the self-interest of the officer or director will be brought into conflict with that of his corporation, *the law will not permit him to seize the opportunity for himself.*

*Id.* at 511 (emphasis added). Over time, the corporate opportunity doctrine, as delineated in *Guth* and its progeny, has evolved into the rule that a corporate director or officer cannot take a business opportunity for her own if:

(1) the corporation is financially able to exploit the opportunity;

(2) the opportunity is within the corporation's line of business;

(3) the corporation has an interest or expectancy in the opportunity; and

(4) by taking the opportunity for his own, the corporate fiduciary will thereby be placed in a position inimicable to her duties to the corporation.

*Broz*, 673 A.2d at 154–55. The Delaware Supreme Court has also held *Guth* created a corollary rule that an officer or director *may* take a corporate opportunity for herself if:

(1) the opportunity is presented to the director or officer in his individual and not his corporate capacity;

(2) the opportunity is not essential to the corporation;

(3) the corporation holds no interest or expectancy in the opportunity; and

(4) the director or officer has not wrongfully employed the resources of the corporation in pursuing or exploiting the opportunity.

*Id.* at 155. Taken together, the tests enunciated in *Guth* define the contours of the corporate opportunity doctrine. *See id.* Under Delaware law, no one factor is dispositive and all factors must be taken into account, as applicable, to assist a reviewing factfinder in balancing the equities of an individual case.[1] *Id.* Ultimately, the factfinder is charged with "the determination of '[w]hether or not a director has appropriated for himself something that in fairness should belong to the corporation . . .'." *Id.* (quoting *Johnston v. Greene*, 121 A.2d 919, 923 (1956)).

With this in mind, I interpret the corporate opportunity doctrine, as set out by *Guth* and construed by its progeny, as directing the finder of fact to apply a two-step analysis in determining whether a director has breached her fiduciary duty of loyalty by usurping a corporate opportunity. Other courts have also interpreted *Guth* as setting forth a two-step approach, thereby creating "a more helpful approach . . . for determining the ultimate question of when liability for a wrongful appropriation of a corporate opportunity should be imposed." *Miller v. Miller*, 222 N.W.2d 71, 81–82 (Minn. 1974); *see PJ Acquisition Corp. v. Skoglund*, 453 N.W.2d 1, 8 (Minn. 1990) (reiterating two-step approach from *Miller*, 222 N.W.2d at 81); *see also Phoenix Airline Servs., Inc. v. Metro Airlines, Inc.*, 397 S.E.2d 699, 702 (Ga. 1990) (noting Georgia Supreme Court adopted *Miller*'s two-step approach to liability). Although the test set out below differs in language

---

[1] In Delaware, the factfinder appears always to be a court of chancery, not a jury. *See Broz*, 673 A.2d at 155 ("the tests enunciated in *Guth* and subsequent cases provide guidelines to be considered by a reviewing *court* in balancing the equities of an individual case." (emphasis added).

from the approach set out in *Miller*, *see* 222 N.W.2d at 81, it does so, in my opinion, to better reflect the law of Delaware regarding the corporate opportunity doctrine, as set out in *Broz*. *Compare Broz*, 673 A.2d at 155 *with Miller*, 222 N.W.2d at 81.

The first step requires the factfinder to answer the threshold question of whether the business opportunity in question is actually a "corporate" opportunity. Under Delaware law, a *business* opportunity is a *corporate* opportunity if the factfinder determines it is by balancing the following factors: (1) whether the corporation is financially able to exploit the opportunity; (2) whether the opportunity is within the corporation's line of business; (3) whether the corporation has an interest or expectancy in the opportunity; and (4) whether by taking the opportunity for her own, the corporate fiduciary will thereby be placed in a position inimicable to her duties to the corporation. *See Broz*, 673 A.2d at 155. No one factor is dispositive. *Id.* In the event the factfinder determines the contested business opportunity *is* a corporate opportunity, the factfinder must then proceed to the second step of the analysis to determine whether it was nonetheless fair for the director to take the opportunity for herself.

In the second step, a factfinder may determine it is equitable for a director to take a corporate opportunity if: (1) the opportunity is presented to the director or officer in her individual and not her corporate capacity; (2) the opportunity is not essential to the corporation; (3) the corporation holds no interest or expectancy in the opportunity; and (4) the director or officer has not wrongfully employed the resources of the corporation in pursuing or exploiting the opportunity. *Id.* As with the first step, the factfinder is to balance the factors as "[n]o one factor is dispositive and all factors must be taken into account insofar as they are applicable." *Id.*

Based upon my review of Delaware law, I make two observations before proceeding with the analysis. First, and contrary to the position taken by appellants, I believe that whether a

corporate opportunity exists is a question of fact to be determined by trier of fact. As set out above, to determine whether an opportunity is a corporate opportunity, the fact finder must balance four factors, keeping in mind that no one factor is dispositive. *See id.* Accordingly, the question is one of fact based on the evidence, not a legal question. Second, the jury in this case was not properly charged under Delaware law — specifically, and as explained below, the jury was presented with a single question with instructions, as opposed to the proper two-step approach required by Delaware law, and the jury was not instructed that the factors should be balanced and that no one factor is dispositive. *See id.*

### *Proper Jury Charge*

Given the interpretation of Delaware law set out above, a proper jury charge for the breach of fiduciary liability issue under Delaware's corporate opportunity doctrine would require two-steps, i.e., two jury questions that independently require the balancing of the equitable factors.[2] It

---

[2] For exemplary purposes only, a proper jury charge under Delaware law on the issue of usurping a corporate opportunity might resemble the following:

1.  Was there a "corporate opportunity" rightfully belonging to the corporation?

    You are instructed that a director or officer of a corporation generally may not take a business opportunity for herself if it is determined the business opportunity is actually a "corporate opportunity" rightfully belonging to the corporation. In determining whether the disputed business opportunity is in fact a "corporate opportunity" belonging to the corporation, you may consider the following four factors:

    A.  The corporation is financially able to exploit the opportunity.
    B.  The opportunity is within the corporation's line of business.
    C.  The corporation has an interest or expectancy in the opportunity.
    D.  By taking the opportunity for her own, the corporate fiduciary will thereby be placed in a position adverse to her duties to the corporation.

    You are further instructed that you should balance the factors and that no single factor is dispositive.

    Answer "Yes" or "No."

    Answer: _____

    If you answered "Yes" to question 1, answer question 2.

would be incumbent upon the trier of fact to first find the existence of a corporate opportunity before it could then move on and determine if the director breached her fiduciary duty to the corporation because she was not entitled to take the opportunity. I find the balancing of factors in each step — the *Guth* rule and *Guth* corollary — analogous to a Texas jury charge on the best interests of a child, i.e., the charge would instruct the jury to balance a list of factors, advising that no one factor is dispositive, to reach its ultimate determination.[3] *See, e.g.*, COMM. ON PATTERN JURY CHARGES, STATE BAR OF TEXAS, TEXAS PATTERN JURY CHARGES: TERMINATION OF PARENT-CHILD RELATIONSHIP, PJC 218.1A (2014) (recommending jury instruction that presents list of factors for jury to consider in determining best interest of child and instructing jury that no one factor is dispositive).

However, the format of the jury charge in this case is notably different. Rather than a two-step approach comporting with our interpretation of Delaware law, the jury was presented with a single question with regard to usurpation of an opportunity. Jury question one asked:

---

2.  Did any of those named below fail to comply with their fiduciary duty of loyalty to the corporation by wrongfully taking a corporate opportunity?

    You are instructed that a director or officer of a corporation may in fairness take a "corporate opportunity" for herself, in the right circumstances. In determining whether a director or officer may fairly take a corporate opportunity for herself, you may consider the following four factors:

    A.  The opportunity is presented to the director or officer in her individual and not his corporate capacity.
    B.  The opportunity is not essential to the corporate.
    C.  The corporation holds no interest or expectancy in the opportunity.
    D.  the director or officer has not wrongfully employed the resources of the corporation in pursuing or exploiting the opportunity.

    You are further instructed that you should balance the factors and that no single factor is dispositive.

    Answer "Yes" or "No."

    Answer: _____

[3] The list of factors used in the best interest instruction arises from Texas case law, specifically *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). This is akin to the factors in the proposed usurpation charge arising from Delaware case law, specifically *Guth*, as set out in *Broz*. *See Broz*, 673 A.2d at 154–55.

Did any of those named below fail to comply with his fiduciary duty to Longview Energy Company by taking a corporate opportunity?

Because they are Longview Energy Company directors, Bill Huff and Rick D'Angelo owe fiduciary duties to Longview Energy Company with respect to corporate opportunities.

A Longview Energy Company director may not take a corporate opportunity for himself if:

(1) Longview Energy Company had an interest or a reasonable expectancy in the opportunity;
(2) Longview Energy Company was financially able to pursue the opportunity;
(3) the opportunity was within Longview Energy Company's line of business; *and*
(4) the director diverted the business opportunity to another and thus brought the director's interests into conflict or competition with Longview Energy Company's interest.

A Longview Energy Company director may take a corporate opportunity for himself if:

(1) the business opportunity is first presented to the director in his individual and not his corporate capacity;
(2) the opportunity is not essential to the corporation;
(3) the corporation does not have an interest or expectancy in the business opportunity; *and*
(4) the director has not wrongfully employed the resources of the corporation pursuing the opportunity.

Answer "yes" or "no" for each of those named below.

(a) Rick D'Angelo

Answer: _____

(b) Bill Huff

Answer: _____

(emphasis added)  The jury answered "yes" in each answer blank.

I believe the format of the charge in this case is incorrect under a proper interpretation of

Delaware law.  Here, the charge presented the issue in a single question as opposed to the two-step

approach required by Delaware law. Moreover, the charge does not account for the principle of Delaware law that, when applying the *Guth* rules, "[n]o one factor is dispositive and all factors must be taken into account insofar as they are applicable" to balance the equities of the case. *Broz*, 673 A.2d at 155. Rather, the charge was given in the *conjunctive*, requiring the jury to find in the affirmative or negative as to each factor in the absence of further instruction. In other words, as a necessary consequence of the charge's basic conjunctive construction, an ultimate answer of "yes" necessarily meant the jury implicitly answered "yes" to each and every element of the "may not take" instruction, and "no" to at least one element of the "may take" instruction. Otherwise, the jury could not have answered "yes" to either question. Although there were objections to the jury charge, none of the objections raised the problems created by the charge's misapplication of Delaware law.[4] However, because the sufficiency of the evidence must be measured by the charge actually given to the jury, I proceed with my review based on the charge as given. *See Romero v. KPH Consol., Inc.*, 166 S.W.3d 212, 221 (Tex. 2005).

### *Legal Sufficiency of the Evidence*

In Texas, "[t]he sufficiency of the evidence must be measured by the jury charge when, as here, there has been no objection to it." *Romero*, 166 S.W.3d at 221. In other words, a court measures sufficiency based on the charge as given. *See id.* Texas law governs matters of procedure and remedy in Texas courts even when another jurisdiction's substantive law applies. *State of Cal. v. Copus*, 309 S.W.2d 227, 230 (Tex. 1958); *see Moonlight Invs., Ltd. v. John*, 192 S.W.3d 890, 894 (Tex. App.—Eastland 2006, pet. denied). Texas standards of review are procedural and apply even when the substantive law of another jurisdiction is applicable. *McAfee,*

---

[4] Appellants objected to the jury charge with regard to the doctrine of corporate opportunity. However, the objections concerned only the content of the elements presented in the charge, rather than the proper format of applying those elements to determine liability, and the sufficiency of the evidence to support the submission. Longview did not object to this portion of the charge.

*Inc. v. Agilysys, Inc.*, 316 S.W.3d 820, 824 (Tex. App.—Dallas 2010, no pet.); *Autonation Direct.com, Inc. v. Thomas A. Moorehead, Inc.*, 278 S.W.3d 470, 472 (Tex. App.—Houston [14th Dist.] 2009, no pet.); *Billman v. Mo. Pac. R.R. Co.*, 825 S.W.2d 525, 526 (Tex. App.—Fort Worth 1992, writ denied). Therefore, it must be determined whether the evidence is legally sufficient to support a rational juror answering "yes" to the existence of a corporate opportunity and each *Guth* rule determination because this was required by the charge actually given. Further, as a consequence of the jury charge given, there must be legally sufficient evidence for a rational juror to answer "no" to at least one element of the *Guth* corollary.

Jury question one asked the jury if Huff and D'Angelo breached their fiduciary duties by taking a corporate opportunity. The charge thereafter instructed jurors that Huff and D'Angelo could not take a corporate opportunity for themselves if: (1) Longview had an interest or a reasonable expectancy in the opportunity; (2) Longview was financially able to pursue the opportunity; (3) the opportunity was within Longview's line of business; and (4) Huff and D'Angelo diverted the business opportunity to another and thus brought their interests into conflict or competition with Longview's interests.

At oral argument, appellants contended jury question one "presumes" the existence of a "corporate opportunity." I respectfully disagree. As charged, I would hold the jury had to first find that a corporate opportunity existed before it could determine whether (1) Huff and D'Angelo diverted an opportunity, (2) in which Longview had an interest or reasonable expectancy, (3) that was in Longview's line of business, and (4) that Longview was financially able to pursue. In other words, I believe jury question one — applying Delaware law — specifically required the jury to determine whether Huff and D'Angelo breached their fiduciary duties by taking a *corporate*

*opportunity*.  Thus, before the jury could find a corporate opportunity was taken, it had to find one existed.

Moreover, each instruction following question one required the jury to find that a corporate opportunity existed before deciding whether Longview had an interest in it, was financially able to pursue it, it was in Longview's line of business, or Huff and D'Angelo diverted it.  Finally, and as discussed above, because of the conjunctive nature of the jury charge, it must not only be determined whether there is legally sufficient evidence of the existence of a corporate opportunity, but it must be determined whether there is legally sufficient evidence for each of the elements set out in the instructions for the jury's collective answer of "yes" to be supported.  If there is legally insufficient evidence of the existence of an opportunity or any one of the elements relating to the usurpation issue, the jury's verdict cannot stand.

### *Existence of a Corporate Opportunity*

Under applicable Delaware law, "[g]enerally, the corporate opportunity doctrine is applied in circumstances where the director and the corporation compete against each other to buy something, whether it be a patent, license, or an entire business."  *Thorpe by Castleman v. CERBCO, Inc.*, 676 A.2d 436, 443 (Del. 1996).  Although the boundaries of what may be considered a business opportunity are not firmly defined, the Delaware Supreme Court has referred to the opportunity as consisting of "specific property."  *Broz*, 673 A.2d at 156 (referring to actual or expectant interest in "specific property") (quoting *Johnston*, 121 A.2d at 924).  The characterization of the contested business opportunity as "specific property" in *Broz* is consistent with the language from *Thorpe*, suggesting the boundaries of what should constitute a "business opportunity" within the meaning of the corporate opportunity doctrine.  *Compare Broz*, 673 A.2d at 156 *with Thorpe*, 676 A.2d at 443.  Therefore, based on Delaware case law, I would hold the

scope of business opportunities for which a cause of action will lie under the corporate opportunity doctrine should be generally restrained to identifiably specific pieces of tangible or intangible property subject to acquisition, e.g., a patent, license, parcel of real estate, an entire business, stocks, etc. *See Thorpe*, 676 A.2d at 443; *Broz*, 673 A.2d at 156. I do not believe Longview has presented evidence of such a specific business opportunity.

On appeal, rather than direct this court to a specific contested piece of tangible or intangible property, Longview's brief describes the allegedly usurped "opportunity" as follows:

> [A] proprietary strategy for investing in the Eagle Ford . . . to make an acreage play in the expanded oil window as [Mark] Lober redefined it, and Longview had identified the only source of acreage within that area.

At oral argument — both before the original panel and then before the en banc court — counsel for Longview defined the opportunity by its "three characteristics" as a ***strategy***: (1) to acquire trend acreage in the Eagle Ford shale, (2) from Tamara Ford who had readily available acreage, (3) where Mark Lober recommended Longview should invest. Additionally, back in 2010, an internal memorandum from Longview CEO Bob Gershen to his fellow board members dated January 25, 2010, elaborated on this "strategy":

> On a hypothetical basis we have outlined a potential Eagle Ford program where we acquire 3,000 acres in each of seven prospects (21,000 acres in all). We then assumed we could find industry partners on a promoted basis for half of each well (on a third for a quarter basis) and drill the first well in each of the seven prospects. Exhibit B shows that based on average industry reported results, our project could be highly successful financially if it proves up the resource value of our acreage. The total capital costs for this hypothetical program (leasehold and drilling) are estimated to be $40 million and could generate results like those modeled by the end of next year.

Appellants note and the record reflects, however, that this "strategy" is unsupported by the identification of specific leases, acreage, landowners, prices, or even drilling partners.

Having reviewed the record, the alleged business opportunity in question, as framed by Longview itself, is a compilation of information that Longview sought to use to further its business. Specifically, Longview had formed what it considered a proprietary strategy to invest in a large region of Texas using the following information: (1) Lober's research, and (2) land exclusively available from Ford. Rather than evidence of a business opportunity under the confines of Delaware's corporate opportunity doctrine, I would hold Longview's allegedly stolen "opportunity" is more akin to a trade secret. *See* DEL. CODE ANN. tit. 6, § 2001 (4) (defining "trade secret" as "information, including a formula, pattern, compilation, program, device, method, technique or process, that: . . . [d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and . . . [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy."); *see also In re Bass*, 113 S.W.3d 735, 739 (Tex. 2003) (defining trade secret as "any formula, pattern, device or compilation of information which is used in one's business and presents an opportunity to obtain an advantage over competitors who do not know or use it."). Longview's pleadings support this conclusion because one of the three characteristics of its strategy/"opportunity," Lober's crucial role in identifying where to actually invest, was pled as a trade secret. Longview's petition asserted it:

> . . . owned multiple trade secrets, including but not limited to: (a) Lober's analysis of seismic and geological data and wells logs; (b) commissioned maps; and (c) economic analyses and projections regarding the Eagle Ford opportunity.

Although the chance to license a trade secret from a third party may in itself be a business opportunity under Delaware law, *see Thorpe*, 676 A.2d at 443, it is not the right Longview sought to protect in this case, i.e., Longview never alleged appellants usurped its opportunity to license a trade secret from a third party.

Moreover, under Delaware's corporate opportunity doctrine, for a corporation "to have an actual or expectant interest in any *specific property*, there must be some tie between that *property* and the nature of the corporate business." *Broz*, 673 A.2d at 156 (quoting *Johnston*, 121 A.2d at 924) (emphasis added). In other words, a corporation has an actual or expectant interest in a business opportunity when there is a nexus, or tie, between the corporation's current business plan and the specific property sought to be acquired. *See, e.g., Broz*, 673 A.2d at 156 (holding that party had no interest or expectancy in business opportunity to purchase cellular license when party "was actively engaged in the process of divesting its cellular license holdings." *Id.*); *Guth*, 5 A.2d at 514 (holding that Loft had interest or expectancy in business opportunity to purchase Pepsi-Cola because Loft had active desire to secure cola supply for distribution in its stores). Here, Longview has not directed the court to any specific property it sought to acquire from a third party from which a factfinder can make a nexus determination under *Broz*. *See Broz*, 673 A.2d at 156. Instead, Longview has only directed the court to evidence of what might amount to intellectual property it *already possessed*, i.e., a compilation of information turned into a strategic investment plan that may amount to a trade secret. I do not believe this evidence amounts to the existence of property comprising an opportunity that Longview may allege appellants wrongfully usurped.

Because I believe Longview has failed to present even a scintilla of evidence of a business opportunity as defined by Delaware law, I would also sustain appellants legal sufficiency challenge with regard to jury question one. *See Regal Fin. Co., Ltd. v. Tex Star Motors, Inc.*, 355 S.W.3d 595, 603 (Tex. 2010). I contend reasonable and fair minded people could not find Longview had an interest or reasonable expectancy in an opportunity because Longview did not produce even a scintilla of evidence that a cognizable business opportunity existed. *See City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005).

Based on the foregoing, I agree we must reverse the jury's finding that Huff and D'Angelo "fail[ed] to comply with [their] fiduciary duty [of loyalty] to Longview Energy Company by taking a corporate opportunity." However, it is my opinion that even if there was more than a scintilla of evidence of the existence of cognizable business opportunity under Delaware law, there is legally insufficient evidence Longview had an interest or reasonable expectancy in it.

### *Longview's Interest or Reasonable Expectancy in the "Opportunity" — Rejection*

Even if there was more than a scintilla of evidence to support the existence of a corporate opportunity, the evidence establishes Longview had no interest or reasonable expectancy in any such opportunity. As stated above, "to have an actual or expectant interest in any specific property, there must be some tie between that property and the nature of the corporate business." *Broz*, 673 A.2d at 156 (quoting *Johnston*, 121 A.2d at 924). Appellants contend the evidence conclusively establishes Longview's board voted to reject the allegedly usurped opportunity to invest in the Eagle Ford shale. Therefore, under Delaware law, there can be no nexus between the alleged opportunity and Longview's business interests because Longview's rejection nullified any potential nexus. I agree.

Under Delaware law, a corporation can forfeit an interest or reasonable expectancy in a business opportunity by expressly disclaiming any interest in it. *See Kaplan v. Fenton*, 278 A.2d 834, 836 (Del. 1971) (holding that corporation disclaimed interest in business opportunity by unanimously rejecting almost identical opportunity one month prior). In other words, a director is free to take a business opportunity for himself once his corporation has rejected any business interest in it. *See McGowan v. Ferro*, 859 A.2d 1012, 1039 (Del. Ch. 2004), *aff'd*, 873 A.2d 1099 (Del. 2005); *Field v. Allyn*, 457 A.2d 1089, 1099 (Del. Ch. 1983), *aff'd*, 467 A.2d 1274 (Del.

1983); *see also Broz*, 673 A.2d at 157 (citing *Field* for proposition and noting Delaware Supreme Court "affirmed the *Field* holding on the basis of the well-reasoned opinion of the court below.").

Further, "[w]hile presentation of a purported corporate opportunity to a board of directors, and the board's refusal thereof, creates a safe harbor for an interested director[,]" *Texlon Corp. v. Meyerson*, 802 A.2d 257, 263 (Del. 2002), express presentation of an opportunity to the board is not required to avoid liability. *Broz*, 673 A.2d at 157. Rather, a director may analyze the situation himself to determine whether the opportunity is one rightfully belonging to the corporation; however, without presentation to the board, the director is subject to "the specter of a *post hoc* judicial determination that the director or officer has improperly usurped a corporate opportunity." *Id.*

Here, the record reflects Longview rejected investment in, and pursuit of, the very business opportunity it claims was usurped by appellants. The record shows Longview investigated the Eagle Ford shale prior to late January 2010, e.g., Longview hired Lober to do geology and geophysics analysis of the Eagle Ford shale, and it contacted land brokers Ford and Gooden with regard to available acreage. However, when given the chance to follow-up on that investigation with an actual investment, Longview decided to pass on the opportunity.

The apparent culmination of Longview's investigation into the Eagle Ford shale opportunity was the plan presented by Longview CEO Gershen to the board of directors on January 25, 2010. In a memo entitled "Path Forward – Recapitalization," Gershen set out a number of corporate growth opportunities including, as discussed above, a hypothetical program to invest $40 million in 21,000 acres of Eagle Ford land.

On January 27, 2010, Gooden emailed Longview executives Fuller and Pearce regarding acreage tracts available for lease in the Eagle Ford shale. Attached to this email is a "blob map"

illustrating well over 100,000 acres of land available for lease.  Gooden advised Fuller and Pearce

that a decision would need to be made quickly because his map reflected "tracts that are open and

available to lease today but not necessarily will be open tomorrow."

On January 28, 2010, Longview's board of directors met.  The minutes reflect Pearce, on

behalf of Longview's management, led a discussion of resource plays available for investment.

Pearce identified the Eagle Ford shale play and the Bakken shale play in North Dakota as offering

the most favorable economics for investment.  However, no vote was taken with regard to these

investment plans.  Instead, Longview's management team was instructed to prepare economic

models for four investment opportunities in advance of a February 1, 2010 board meeting.  The

potential investments included: (1) buying back 1.2 million shares of stock at $5 a share, (2) paying

down corporate debt for 12 months at $500,000 per month, (3) investing $6 million in the Eagle

Ford shale, and (4) investing $6 million in eight wells in California where Longview already had

a presence.  Each of the potential investments in Texas and California, as noted, were for $6

million.

On January 29, 2010, Fuller emailed Pearce, Gershen, and two others regarding a telephone

discussion Fuller had with Gooden.  Fuller reported that:

> I just called Pat Gooden and told him that as a result of the Board meeting yesterday
> [January 28, 2010], Longview will not be able to provide capital for trend acreage
> in the Eagle Ford.  He was disappointed but polite . . . He asked if Longview would
> mind if he submitted acreage to the other Huff portfolio company (and I can't recall
> their name right now) to see if possibly they might be interested.  I told him I
> thought it would be a waste of his time given what we learned yesterday about
> Huff's lack of appetite for trend acreage, but wished him the best.

On February 1, 2010, Longview's board of directors gathered for a special meeting.  At the

meeting, a quorum of directors unanimously adopted a resolution charging the management to,

among other things: "(a) promptly prepare for Board review and approval a five to eight well

California drilling program to be funded by cash flow from operations . . . and (c) aggressively continue discussions with potential merger candidates [for Longview]." Although this resolution was proposed by D'Angelo, it is noteworthy that it was unanimously adopted by the remaining six Longview board members who were not associated with appellants. The record does not reflect any other votes by Longview's board with regard to pursing an investment in the Eagle Ford shale.

As noted above, Delaware law allows a director to take a business opportunity for himself once his corporation has rejected it. *See McGowan*, 859 A.2d at 1039, *aff'd*, 873 A.2d 1099 (Del. 2005); *Field*, 457 A.2d at 1099, *aff'd*, 467 A.2d 1274 (Del. 1983). The foregoing sequence of events supports the conclusive finding that Longview rejected the very investment opportunity it alleges was usurped by Huff and D'Angelo, i.e., investment in thousands of available Eagle Ford acreage generally identified as blobs on a map. In fact, Longview rejected the opportunity twice. Initially, Longview passively rejected the opportunity by failing to approve Pearce's plan presented at the January 28, 2010 meeting. Then, three days later, on February 1, 2010, Longview's board definitively rejected investing in the Eagle Ford shale by unanimously voting to invest its available funds in California instead. According to the record, at least two board members, Pearce and Gershen, cast their vote in favor of California prospects knowing Gooden would offer the land to another Huff Energy Fund portfolio company. Moreover, Gershen, Longview's CEO and author of the investment plan set out in the January 25, 2010 memo, voted in favor of the California opportunity as opposed to investing in the Eagle Ford shale. Accordingly, because Longview rejected the alleged Eagle Ford shale opportunity, I would also hold directors D'Angelo and Huff could pursue that opportunity individually without breaching their fiduciary duties to Longview.

On appeal, the practical result of this conclusion is that there is legally insufficient evidence of Longview's interest or reasonable expectancy in the Eagle Ford shale opportunity as required by the jury charge. By rejecting the opportunity, Longview effectively disclaimed any tie between the alleged opportunity and the nature of its business, and is, in effect, estopped from claiming otherwise under Delaware corporate opportunity law. Stated alternatively, Longview, as an oil and gas company, voted it was no longer interested in the opportunity to invest in the developing Eagle Ford shale. Accordingly, I would also sustain appellants' legal sufficiency challenge because the evidence conclusively establishes the opposite of a vital fact, i.e., the evidence conclusively establishes Longview did not have an interest or reasonable expectancy in the purported business opportunity. *See Regal Fin. Co., Ltd.*, 355 S.W.3d at 603.

Longview raises two counter points to this conclusion regarding rejection: (1) corporate rejection requires an informed decision by the board of directors; and (2) Longview's rejection must be viewed in the context that it "actively pursued the Eagle Ford opportunity until Huff and D'Angelo unilaterally backed out of their false funding representations."

First, Longview argues "[r]ejection is a viable defense *only* if the defendant fully discloses all material facts to the corporation and the corporation's board gives informed approval for the [director] to exploit the opportunity on their own." I disagree. Longview is conflating its independent rejection of the alleged opportunity with the possibility of rejecting appellants' non-existent attempt to invoke the safe-harbor rule.

In support of its argument, Longview cites to the following selected language from a footnote in *Thorpe*: "[d]isclosure to and informed approval by the board. . ." *See Thorpe*, 676 A.2d at 442 n.7. However, the full sentence in *Thorpe* reads "[d]isclosure to and informed approval by the board *may* insulate a director from liability where the corporate opportunity doctrine otherwise

applies." *Id.* (emphasis added). The court in *Thorpe* then cited to *Broz* as the court set out Delaware's law on the safe-harbor exception. *Id.* Therefore, the authority Longview relies upon is clearly referring to "rejection" in the context of seeking safe-harbor protection, which would require a higher level of candor from D'Angelo than he exhibited, i.e., informing his fellow board members that Huff Energy Fund was not interested in Eagle Ford shale trend acreage when Riley-Huff Energy had just made that very investment days before. *See generally Mills Acquisition Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1283 (Del. 1989) (noting duty of candor "dictates that fiduciaries, corporate or otherwise, may not use superior information or knowledge to mislead others in the performance of their own fiduciary obligations," which would likely include voting on whether to reject pursuit of a presented business opportunity). Here, however, Longview independently rejected pursuit of the alleged opportunity, and there was no attempt by appellants to invoke safe-harbor protection. Unless a director is seeking safe harbor, Delaware law does not require a director to present an opportunity to the board for approval before taking it for himself. *See Broz*, 673 A.2d at 157.

However, even if Longview's claim about Delaware law and rejection was correct, it would not negate appellants' rejection claim. There is no question Longview's board was aware of the Eagle Ford shale opportunity that it claims was its proprietary plan; therefore, the equitable purpose of presenting the opportunity to the board for informed approval or rejection was satisfied nonetheless.

Second, in addition to its argument regarding informed rejection, Longview also attempts to soften its affirmative rejection of the alleged Eagle Ford shale opportunity by pointing out Huff "promised" to fund Longview's investment in the Eagle Ford shale but ultimately did not do so, requiring Longview to pass on the opportunity. Therefore, presumably, Longview cannot be held

accountable for rejecting the opportunity because Longview relied on Huff's promised funding, without which it could not immediately invest in the Eagle Ford shale. However, Huff's alleged promise to fund any Longview investment "that Rick Pearce liked," is not in writing; rather, it is only supported by testimony in the record that "Bill Huff said that if we would locate an investment in the Eagle Ford shale that Rick Pearce liked, that he would fund it." Longview's CEO Gershen admitted at trial there was no enforceable agreement requiring Huff to provide Longview with investment capital,[5] and although alleged by Longview, there is no substantive Delaware law placing a duty on either directors or shareholders of a corporation to contribute additional capital for a corporation's investment. Accordingly, because the alleged promise was unenforceable, I do not believe Longview's reliance entitles it to a different result with regard to our rejection analysis. To do so would, in essence, grant Longview relief it did not seek, i.e., recovery for breach of contract, and would also ignore the fact Longview still had six million dollars it could have invested in the Eagle Ford shale, instead choosing to spend the money in California.

### *Longview — Financial Ability to Pursue the "Opportunity"*

I further note that even if a corporate opportunity existed and Longview had not rejected it, Longview had to present some evidence it was financially able to pursue the alleged Eagle Ford shale opportunity. Longview was unsuccessful in this regard.

Delaware law allows reviewing courts "a number of options and standards for determining financial inability, including but not limited to, a balancing standard, temporary insolvency standard, or practical insolvency standard. *See Yiannatsis v. Stephanis by Sterianou*, 653 A.2d

---

[5] Gershen was correct. Under Delaware law, Huff's alleged oral promise to invest millions of dollars runs afoul of the Delaware statute of frauds. *See* DEL. CODE ANN. tit. 6, § 2714 ("A contract, promise, undertaking or commitment to loan money or to grant or extend credit . . . in an amount greater than $100,000 . . . made by a person engaged in the business of lending money or arranging for the lending of money or the extending of credit shall be invalid unless it or some note or memorandum thereof is in writing." *Id.* § 2714(b)).

275, 279, n. 2 (Del 1995).  Admittedly, as a general matter, it appears a challenging fiduciary "faces a significant burden in establishing that a corporation was financially unable to take advantage of a corporate opportunity." *Norman v. Elkin*, 617 F. Supp. 2d 303, 312 (D. Del. 2009); *see, e.g., Broz*, 673 A.2d at 151–55 (finding inability where corporation had just emerged from contentious Chapter 11 bankruptcy with obligations owed to creditors limiting ability to commit capital to acquisition of new assets).  Despite this burden, there is legally insufficient evidence to support the jury's implied finding that Longview had the financial ability to invest in the Eagle Ford shale opportunity, i.e., there is less than a scintilla of evidence of Longview's financial ability. *See Regal Fin. Co., Ltd.*, 355 S.W.3d at 603.

The evidence shows Longview needed approximately $40 million in capital.  Appellants point out that Longview had $27 million in debt, secured by unspecified liens.  They also note that Longview seemed to rely on Bill Huff's casual statement in September 2009 that "if Longview would locate an investment Pearce liked, he would fund it."  In response, Longview points to evidence it claims establishes it could have raised the required money through stock sale recapitalization as suggested in January 25, 2010 "Path Forward – Recapitalization" memo sent to the board of directors.  Longview also points to the testimony of Rick Pearce.  When asked "[c]ould Longview have raised the money with enough time to fund this type of [investment]," COO Pearce, responded "Yes, we had in the past and we could again."  The record reflects that from 2002–07, Longview raised $167.8 million in capital.  Of that sum, $39 million was raised from Huff Energy Fund between 2006 and 2007.  However, the evidence shows this money was raised over a significant period of time — five years — and the record is replete with evidence that with regard to the alleged opportunity in the Eagle Ford shale, time was of the essence.  Pearce also testified Longview could have sold its California, Oklahoma, and Alaska assets and taken advantage of a

$5.5 million line of bank credit. This too would have taken significant time, perhaps as much as three months.

As to any reliance by Longview on Huff's alleged promise that he would fund whatever Pearce "liked," this does not constitute evidence that Longview was financially able to take advantage of the alleged "opportunity." Longview suggests it had an agreement with Bill Huff whereby he would fund any investment Rick Pearce found for Longview. As discussed above, under Delaware law, Huff's alleged promise was not reduced to writing. Indeed, the existence of the "promise" is only supported by testimony from Pearce. However, Gershen correctly conceded, there was no enforceable agreement requiring Huff to provide Longview with any investment capital. *See* DEL. CODE ANN. tit. 6, § 2714(b). And, as previously noted, there is no substantive Delaware law placing a duty on either directors or shareholders of a corporation to contribute additional capital for a corporation's investment.

And Huff's alleged promise would not be enforceable under Texas law, if it were applicable. A contract is not enforceable if it is so indefinite as to make it impossible for a court to fix the legal obligations and liabilities of the parties. *See T.O. Stanley Boot Co., Inc. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992); *In re C.H.C.*, 396 S.W.3d 33, 48 (Tex. App.—Dallas 2013, no pet.). As the court stated in *T.O. Stanley Boot Co.*:

> In order to be legally binding, a contract must be sufficiently definite in its terms so that a court can understand what the promisor undertook. The material terms of the contract must be agreed upon before a court can enforce the contract. Where an essential term is open for future negotiation, there is no binding contract.

847 S.W.2d at 221. Here, taking Pearce at his word, there is nothing but a vague, indefinite promise to fund some unknown venture, at some unknown time, in some unknown amount. Thus,

even under Texas law, Longview never had an enforceable promise from Huff upon which it could legally rely for purposes of funding an investment in the Eagle Ford shale.

As to Pearce's other statements regarding raising funds through stock sale recapitalization, as in the past, or by selling assets in other states, there is no evidence that these fundraising tactics could have been accomplished in a timely manner so as to allow Longview to undertake the alleged opportunity of buying thousands of acres in the Eagle Ford shale. As noted above, past fundraising efforts of the sort necessary to take advantage of acreage in the Eagle Ford shale took time. As Pearce testified, with regard to investing in the Eagle Ford shale, time was of the essence and Longview's "plan" assumed it would have $40 million to invest — money from Huff. Other than Pearce's alleged reliance on Huff — an unenforceable, indefinite promise — there is nothing in the record to show Longview had taken any affirmative steps to raise the necessary funds. In fact, according to Pearce, Longview "had never looked at an alternative plan of funding." Thus, according to Pearce, at the time the board rejected the hypothetical plan to invest, there really was "nothing to vote on."

Accordingly, based on the evidence regarding timing and Pearce's affirmative statements that Longview was relying on an alleged, unenforceable promise from Huff — having failed to even investigate alternate funding — I would hold there is no evidence that would have enabled reasonable and fair minded people to conclude Longview was financially able to pursue the alleged opportunity. *See City of Keller*, 168 S.W.3d at 827.

## CONCLUSION

Thus, for the reasons set out above, I respectfully concur in the majority's judgment. Although I would resolve appellants' complaints relating to jury question one as set forth above, I

ultimately agree with the majority's conclusion that the trial court's judgment must be reversed

and a take nothing judgment rendered in favor of appellants.


Marialyn Barnard, Justice